PHILIP E. BROWN and Others v. MAPLEWOOD CEMETERY
ASSOCIATION and Others.[1]

April 4, 1902.

Nos. 12,775—(158).

### Cemetery Associations—Private Profit.

G. S. 1878, c. 34, tit. 3 (G. S. 1894, §§ 2913–2929), entitled "Corporations Other Than Those for Pecuniary Profit," as amended by Laws 1872, c. 52, does not authorize the incorporation of burial places for private speculation and profit.

### Same.

In view of the public nature of the use of cemetery grounds, a corporation organized for the avowed purpose "of establishing a public cemetery," without capital stock or contributions from the members, cannot be adapted to the acquisition of profits and emoluments by the directors and incorporators.

### Trustee of Lot Owners.

A cemetery association, having sold lots as burial places, which have been appropriated for that purpose, is a trustee for the benefit of those who lawfully make use of such lots, and is in duty bound to account to its beneficiaries—the lot owners—for moneys received therefrom.

### Purchase Price of Lots.

The directors of such a cemetery association are not authorized to withhold money received for lots from the treasury of the corporation, or treat it as their private property; such funds are subjected to a public use, in which the lot owners have a private and personal interest, not common to the general public.

1 Reported in 89 N. W. 872.

**Denial of Trust—Accounting.**

The denial by the members of such organization of any trust relation to the lot owners who have buried their dead in the cemetery, and a refusal to account for moneys received and appropriated by them, authorizes judicial interference to compel the recognition of the trust relation, and the restoration of such funds to the treasury, for the proper improvement and maintenance of the burial grounds.

**Complaint Good on Demurrer.**

Upon demurrer to a complaint, it is *held* to show a cause of action, arising from the illegal conversion of trust funds of a cemetery association by its directors, and to justify an examination into the use of such funds to establish the trust which is denied, with power in the court to grant such further equitable relief as the nature of the facts disclosed requires.

Appeal by plaintiffs from an order of the district court for Rock county, Cray, J., sustaining a general demurrer to the complaint. Reversed.

*A. J. Daly*, for appellants.

*Nye & Deutsch*, for respondents.

LOVELY, J.

Appeal from an order sustaining a demurrer to plaintiffs' complaint. This pleading was held insufficient by the court below upon the grounds that plaintiffs had no legal right to maintain the suit, and that it does not state a cause of action. We shall attempt to condense the alleged grievances, of which plaintiffs complain at length, into as brief a statement as the essential questions involved will permit.

In 1886 three of the defendants, with three others not joined, incorporated, under G. S. 1878, c. 34, tit. 3 (G. S. 1894, §§ 2913–2929), in the name of the "Maplewood Cemetery Association of Luverne, Minnesota." The purpose of the corporation was declared in the articles to be

"The establishing of a cemetery association for the purpose of opening and maintaining a public cemetery in the vicinity of the village of Luverne."

It is set forth in due form that the specific object of the incorporators and their successors was and always has been declared by

them to be to create a legal entity to hold in trust the title of real estate and property acquired by the corporation, and to use and invest the proceeds of sales of lots for the benefit of the cemetery. One of the original incorporators died previous to the commencement of the action, two have resigned their membership, and others, who are made defendants, were elected in their places.

Under the articles of incorporation, new members can be admitted only upon a majority vote of existing members. None of the members contributed anything to the corporation. It had no capital stock, and no contribution was required to become or continue a member. A board of six directors was provided for (who were the incorporators), to hold until the next annual meeting, when their successors were to be elected for a term to be designated in the by-laws. The officers of the corporation were to be a president, vice president, treasurer, secretary, and actuary. By-laws were adopted, providing that all officers must be elected each year thereafter by the board of directors; that no deeds should be issued for burial lots until paid for in cash or bankable paper. It was made the duty of the directors to provide a plan for the improvement of the cemetery, fix prices of lots, and establish rules and regulations, which was done, whereby the corporation retained general control, management, and improvement of the cemetery grounds.

Upon its organization the corporation purchased from one of its members a tract of land of about thirty acres. It then set apart and dedicated to the public, by the record of a plat, as a public cemetery, eight acres thereof. On this plat lots, blocks, sidewalks, and parks were delineated. Since the record of the plat the members and officers of the corporation have at all times held themselves out as the subordinate agents and trustees of the property for lot owners, and not only the plaintiffs, but two hundred other persons, have purchased lots, and received deeds therefor, from the corporation, for which they have paid substantial prices. In the deeds received by such purchasers, the use of the lots was limited to the burial of the dead therein, subject to the rules and regulations of the association. It is charged that the organizers of the cemetery and their successors have conspired

together to operate the same for their own private benefit and gain. We do not extend these allegations in full, for the reason that it is substantially alleged that such purposes have been actually consummated as hereafter detailed.

It is also made a matter of complaint that, not more than ten days after the record of the plat, the corporation conveyed to each of its directors a lot in the cemetery, ostensibly for valuable sums of money, but with a corrupt and secret intent to defraud other lot owners neglected to collect or receive the purchase price therefor, and gave away one other lot, whose price had been fixed at $250, to a third person.

It is further stated: That the corporation, through defendants, prior to May, 1900, received upwards of $5,500 for cemetery lots from the citizens of Luverne and vicinity; also large sums of money for other lots sold since that time. That the present defendants, who are members of the corporation, have converted a large portion of this money to their own use. That they have made, and still make, the unfounded and fraudulent claim that the corporation has borrowed money and paid interest thereon to the amount of $900; that it has made expenditures exceeding $1,300 for the services of defendants in managing its business, and now has no more money or credits in its hands than $500 in value. That up to the present time defendants and their associates, while acting as directors, have loaned themselves large sums belonging to the corporation, and have falsely claimed that it was necessary for the corporation to borrow money and pay interest thereon. That they have sold a large number of lots to parties who are insolvent, without receiving payment therefor. That, in the aggregate, the corporation has received for lots sold, for burial permits, for rent of platted ground, and other leases, over $7,000, while it has expended for lawful purposes no more than $3,000. That the balance of the money so received and unexpended has been taken by the members and directors of the corporation and converted to their own use, which fact has been fraudulently concealed from the plaintiffs and other lot owners who are not members of the corporation. That the corporation has failed to keep account books showing lots sold, the names of the pur-

chasers, or the prices paid therefor, or what has been done with the moneys received.

It is further alleged that in the year 1900 the citizens of Luverne built a sidewalk to the cemetery, and, in conjunction with the lot owners, asked the defendants to aid in continuing this walk along the grounds; that the defendants refused to comply with this request, for the alleged reason that the corporation had no money on hand or invested with which it could pay for building the same; that an investigation followed, when the discovery was made that defendants had converted to their own use the trust funds and property of the association. It is also set forth that defendants deny that the real estate and property devoted to cemetery purposes is held by the corporation upon any trust, or that the corporation is under any implied duty to act for the interest of the lot owners or the public. It is likewise charged that the defendants are incompetent and improper persons to manage and control the affairs of the corporation; that they have neglected to set out trees and improve the cemetery; that they have failed to secure a sufficient supply of water, and appliances for pumping and distributing it therein, and have prevented lot owners from ornamenting the lots and graves of their dead; that disputes have arisen since the beginning of the year 1900 between the plaintiffs, with other lot owners, and defendants, which have grown to such an extent that the lot owners have lost confidence in the corporation.

This action is maintained by plaintiffs in their own behalf, and for the benefit of all others similarily situated. The prayer for relief asks, among other things, that defendants be relieved from the control of the cemetery; that a receiver be appointed to take custody of the trust property until such time as a competent person or trustee can be appointed to manage the affairs of the association; that the court require the defendants to render a complete account of their receipts and expenditures, and of all doings of themselves and their associates in the management of the property from the time of its organization, and be required to turn over to the receiver or a new trustee the real estate of the association, and all moneys and property arising from the sale of

lots and use of the real estate held under the alleged trust, as well as for general relief.

Defendants demurred upon the following specific grounds: First, that plaintiffs have not the legal capacity to sue; second, that there is a defect of parties plaintiff; third, that the complaint does not state a cause of action.  This demurrer was in all things sustained, and upon this appeal the plaintiffs' contentions are that defendants hold the title to the real estate purchased for a cemetery in trust for the purchasers of lots, and not for private gain or profit; that the lot owners are the beneficiaries of the trust, and have the right, as such, to a full account of the receipts and disbursements of defendants in their management of the trust estate; that, after payment for the property and all necessary expenditures in maintaining it, the surplus should have been placed in the treasury for appropriation solely to its use as a public cemetery. It is further urged for plaintiffs that the appropriation of the entire surplus after payment for the property, as alleged, without applying any portion of it to its improvement, and the refusal to account for the use of the funds, in connection with a denial of all relation of trust and confidence between the lot owners and defendants, justify, upon equitable grounds, judicial interference to secure to the beneficiaries the relief demanded.

Defendants combine the first two grounds of demurrer, and contend in respect thereto (1) that the Maplewood Cemetery Association is a private corporation, in which there is no trust relation between the corporation and the lot owners; (2) that the complaint does not tend to show that plaintiffs, or those whom they represent, have any special or private complaint against the corporation not common to the rest of the community, and, if its allegations show malfeasance or derelictions of duty by defendants, they are matters in which the state only, in its sovereign capacity, has a right to complain, and can only be redressed in a suit brought by the attorney general on the relation of the parties interested.

That we may accurately present the contentions of respondents here, we quote literally the following propositions from the brief of counsel:

"They [defendants] have made no pretense of giving free burial, or in any way acting as a public charity or as an eleemosynary corporation, but  *  *  *  have established the cemetery upon a business basis, looking for financial returns, and in no way appear to differ from all other private corporations, with certain public functions, such as railroads, turnpikes, gas, water, electric, telephone, etc., companies."

And again: "That the entire transaction was simply a voluntary, private, business agreement between the appellants and the corporation, depending entirely upon their own volition and choice; and their liability to the corporation was fixed by the price agreed upon as the purchase price of the lot, and finally determined upon the payment of the same."

These claims possess the element of novelty, at least. We had not supposed that public burial places had become in this state the subject of irresponsible speculation and profit, or that, under legislative authority, a corporate entity might be established through which land could be secured for a small price, to be devoted to cemetery purposes, whereby its value would be greatly enhanced, and thus secure to the promoters of the scheme the entire usufruct, without personal investment, contribution, risk, or accountability. Unless we misapprehend the enlightened public sentiment which has largely made the mortuary law in this country, the fierce race for wealth, even in this commercial age, restrains its trafficking hands at the portals of the grave. That this is the general view, we have no doubt. At the supreme moment when friends or relatives pass from earth, the bereaved, upon whom the duty of providing decent Christian interment for the deceased is imposed, seldom inquire into the title of the place accepted for that purpose, or engage in a careful examination of articles of incorporation, but rely with confidence upon the kind attributes and generous impulses of their fellow men in furnishing a sepulture for the repose of their dead, which may be ornamented by those memorials of affection through which it is sought to assuage "the grief within that passeth outward show." In view of the reverence which is universally attached to the place where the ashes of our dead repose, the claims of respondents raise this appeal into a matter of more than usual importance, and it behooves us to seriously and patiently examine the legal grounds

upon which they are based; for, if of substantial force, it must be of the greatest moment to those whose bereavements subject them to the questionable consideration of speculators in burial lots.

The Maplewood Cemetery Association was incorporated under G. S. 1878, c. 34, tit. 3, subsequently amended previous to 1886 (the date of incorporation), which amendments are included in G. S. 1894, § 2913, and cited in the footnote thereto.   In the adoption of the last revision of our statutes (1866) chapter 34 divides and classifies corporations according to their distinctive character and attainable objects.   This classification has been continued to the present time.   G. S. 1866, c. 34, § 54 (being the first section of title 3 therein) provides for the incorporation of schools, colleges, and organizations of a kindred character, which are denominated in Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, as "eleemosynary corporations," or as "benevolent societies" under Foster v. Moulton, 35 Minn. 458, 29 N. W. 155.   In 1872 G. S. 1866, c. 34, § 54, was amended by including therein, among other societies, the words "cemetery association."   Laws 1872, c. 52.  A critical examination of G. S. 1866, c. 34, tit. 3, except as amended in 1872, fails to discover any other reference whatever to cemetery associations, and does not indicate any purpose to provide for the burial of the dead.

While some restrictive provisions of title 3, to which we shall call attention later, might be regarded as applicable to cemetery organizations, yet they were and had previously been applied solely to the benevolent corporations embraced in such title.   Its provisions were by the amendment of 1872 thus attempted to be made adaptable to organizations of a peculiar character, in many respects different from those previously included therein.   By the words of the amendment, "cemetery association," the legislature undoubtedly sought to secure substantial results by merely dropping these words into connection with the other provisions of section 54, supra, without considering it material to provide many necessary details incident to cemeteries.   By section 3, article 9, of the state constitution, authority is given the legislature to exempt public burying grounds from taxation.   This provision of the organic law has been made effective through the enactment

by the legislature of appropriate acts to effectuate such exemptions, as in the general tax law (G. S. 1878, c. 11, § 5, subd. 2; G. S. 1894, § 1512), as also in the acts for the organization of cemeteries (G. S. 1894, §§ 3107, 3134).

It is inconceivable that these exemption privileges should be granted for the purpose of aiding schemes for private profit. When we consider the essential characteristics of cemeteries,—the manner in which, under the custom and habits of the people of this whole country, they have been adapted and made appropriate to the uses of civilization,—the amendment of 1872 seems to be an example of imperfect legislation, if we are not permitted to go beyond the scope and details of title 3. In laying out a cemetery, the first essential is a plat, and record of the same. No provision is made therefor in title 3. The necessity of accurate mortuary statistics is recognized and provided for in all enlightened governments,—particularly our own. The furnishing of such statistics falls within the duty of a cemetery officer, as an actuary. Proper police regulations are needed to prevent the violation of the graves of the dead, or improper conduct in burial grounds, which must necessarily be enforced by the managing officers of the corporation. These requirements, indicating the settled policy of the state in those respects, are to be found in G. S. 1894, c. 34, tit. 5, §§ 3093 to 3097, inclusive, and §§ 3103 to 3108, inclusive.

In recurring to the articles and by-laws of the Maplewood Cemetery Association, we find that such provisions have been adopted and applied in its organization; and it would seem to follow that if the incorporators had to go to title 5, in providing for the organization and maintenance of a cemetery, created under title 3, that the provisions of title 5 have a potent weight in indicating the settled policy of the state in regard to places incorporated under the incomplete and defective amendment of 1872. Without particularizing, it may be stated that title 5 indicates that cemetery uses are public; that the members of such associations have a recognized and valuable interest in their management, as well as that no gain or profit is to accrue to the directors or incorporators. Hence we should not extend to title 3, after the amendment of 1872, by implication, the conclusion that private profit and

gain is to be derived therefrom, against the policy of the state as indicated in the general trend and purpose of all other constitutional and statutory provisions on the subject. But, independent of the peculiar character of "cemetery associations," as distinguished from the benevolent corporations provided for in G. S. 1878, c. 34, § 166 (G. S. 1894, § 2913), its definitive heading of the title itself, as enacted into the revision of 1866, and continued thereafter, is opposed to the claim that corporations organized thereunder are for gain or profit to their incorporators. The headline of the title reads as follows: "Corporations other than those for pecuniary profit;" and, going through the body of this title, nothing is to be found therein conflicting with the expressed limitations implied by such statutory headline. That the purpose of title 3, as thus indicated by such headline, is to exclude from its benefits organizations for pecuniary profit, has been declared in previous decisions of this court. Sheren v. Mendenhall, 23 Minn. 92; Foster v. Moulton, 35 Minn. 458, 29 N. W. 155; State v. Critchett, 37 Minn. 13, 32 N. W. 787.

But what we find to be a more serious difficulty with the claim of respondents is a provision of the very title under which it was organized. In G. S. 1878, c. 34, § 173 (G. S. 1894, § 2921), it is provided that

"No dividend or distribution of property among the members or stockholders is lawful until the dissolution of the corporation."

This section is cited for respondents to support the view that they have a private interest in the property of the corporation upon the dissolution of the same. We are unable to give any force to this view, for it does not follow that upon such dissolution the assets are to be distributed, if not contemplated by the articles of association, or if the corporation, from the very nature of its use, is perpetual. In recurring to the articles of association, it appears that it was organized for the purpose of a "public cemetery"; that it has no capital stock, and that the members contributed nothing, —from which conditions it follows that dividends and profits for distribution are not to be anticipated.

While it is undoubtedly true that legislative authority, in the

exercise of its large and omnipotent powers to protect health by proper regulations, as in overcrowded cities, may provide for the removal of the dead, and in some jurisdictions may also, in the enforcement of the right of eminent domain, where great public interests require, subordinate the use of burial places to the common welfare, yet, subject to such exceptions (not involved here), cemeteries are to be regarded as inviolate, and their use appropriated as a sacred place, consecrated by the elements of taste and affection, to be preserved from profanation through every mutation of human creeds, as well as from the baser conquests of Mammon. Campbell v. Mayor, L. R. 9 Eq. 579; Moreland v. Richardson, 24 Beav. 33. As the best result of all the authorities in this country upon this phase of the subject, we adopt and approve the language of that eminent jurist, Chancellor Runyon: "The object of burial is not to put the dead away temporarily, merely, but to place them in a final resting place. When land is given in trust for a burial place, it obviously can by no means be said that the trust is at an end when the last body which can be buried in it has been deposited. The expectation in the burial of the dead is that they are to remain permanently, and the unauthorized disturbance of their remains is regarded with abhorrence, as a desecration, and is criminal. A trust for a burial place devotes the ground to the perpetual repose of the remains of the dead. It dedicates it to uses of the most sacred character. The burying ground is God's acre." Stockton v. Mayor, 42 N. J. Eq. 531, 541, 9 Atl. 203.

The provision—G. S. 1878, § 173; G. S. 1894, § 2921—forbidding dividends or distribution, always a part of title 3, is applicable to, and continued to be a part of, the law when amended in 1872. Black, Interp. Laws, pp. 356, 357. Hence it would seem that, under an expressed prohibition, no gain or profit could accrue to the members or directors of the Maplewood Cemetery Association. Unless we fail to realize the effect of the previous views of this court, this question has already been passed upon. Speaking through the late Justice DICKINSON, it was held in Wolford v. Crystal Lake Cemetery Assn., 54 Minn. 440, 56 N. W. 56, that "The purposes for which cemetery corporations may be organized

are public, rather than private; and the land acquired by such corporations, and devoted to the purposes of burial, are held in trust for public, rather than private, use. * * * The public character of such corporations, and of the purposes to be subserved by them, * * * may be asserted not merely because of the nature of the subject, but because the statute justifies it. * * * No purpose of private gain or benefit is contemplated by the law, but only the accomplishment through such corporate agencies of the same public purposes which in the absence of such a statute, or in the event of no such corporations being organized, would generally be accomplished by the exercise of powers conferred upon towns, villages, and cities."

This case would seem to be decisive against the contention of respondents that their organization was for their private benefit and profit, but the distinction is urged that the association therein considered was organized under title 5, while this was incorporated under title 3, supra. A careful consideration of this decision in connection with both titles leads to the inevitable conclusion that it is as applicable to cemetery associations organized under one as the other.

In the syllabus of the last case cited (prepared by the court) it is held that "the purposes for which alone cemetery corporations may be organized under our laws are public, rather than private"; that the lands platted and used to bury the dead are thereby dedicated to that purpose exclusively; and that "after such dedication the corporation is without power, for reasons in which the public is concerned, to convey any of such lands, except for the exclusive purpose of burials, or to mortgage the same." Chapter 34, tit. 5, supra, will disclose no express restriction upon the power of such corporations to convey or mortgage the corporate property; and the decision in Wolford v. Crystal Lake Cemetery Assn., supra, necessarily rested upon the characteristic uses of cemeteries as such in this state. It cannot be doubted that a college, school, or seminary organization, under title 3, would have a right to borrow money and mortgage its property to secure the objects of the association; but Wolford v. Crystal Lake Cemetery Assn. forbids such power of alienation,—the highest right of a citizen to

real property,—because such power is incompatible with the objects of a burial place, which, as said by Justice Story in Beatty v. Kurtz, 2 Pet. 566, is to consecrate to the use of the dead a perpetual servitude or easement, to minister to the feelings of religion, the sentiments of natural affection by kindred and friends, and to preserve memorials erected, through piety and love, to the memory of the departed. Since the decision in Wolford v. Crystal Lake Cemetery Assn., the principle there declared, that, under the policy of this state, cemeteries are not the subject of financial speculation, rights of a most important nature have become affected thereby, and are involved in our adherence to the doctrines therein laid down; but, if the question was a new one, for the reasons we have heretofore given, we should not hesitate to adopt the same conclusion, and hold that burial places dedicated to public use under the provisions of title 3, supra, are not to be degraded to the sordid enterprises of the money-maker.

One further test of the character of the rights which the incorporators of the Maplewood Cemetery Association possessed is suggested by the consequences that would follow from the levy of an execution thereon for their debts. Could such execution be made out of such property, or would a court appoint a receiver to operate it in a creditors' suit to apply the income to liquidate claims against members thereof, and in what way in the meantime would the receiver's right to control the property affect the lot owners? We find in a quite recent decision of the supreme court of Nebraska very pertinent answers to these inquiries. That court, speaking through Holcomb, J., says:

"The only question involved is whether, under the facts as narrated, a court is authorized to sequester the property by equitable execution, and sell the same in satisfaction of the debts of the owner of the legal title. We do not think this can be done. It is beyond cavil that the property has been duly and legally platted and dedicated to cemetery purposes, and is now, and was at the time of the institution of the suit, a public burying ground. * * * It is not the policy of the law, nor the intention of the legislature, * * * to invade the silent precincts of the dead, and there hold high carnival in an unseemly contest as to which of contesting

litigants shall profit by the sale of the necessary part of mother earth to enfold in its peaceful embrace the last that is mortal of man." First National v. Hazel (Neb.) 89 N. W. 378.

We pass next to the claim of plaintiffs that a trust was impressed upon the managers of this association for the benefit of its lot owners. This is emphatically denied on behalf of respondents. The distinction between private corporations and the benevolent associations authorized in title 3, supra, is elementary. It is, as we have seen, recognized by the distinctive classification of corporations in all the subtitles of chapter 34; but among the substantial conditions attached to either may be an obligation of trust and confidence imposed upon those who control them, whether the trust is expressed or implied by law. This principle is thus stated by an eminent text writer:

"Whenever the legal title to property * * * has been obtained through * * * means or under any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same, although he may never perhaps have had any legal estate therein." 2 Pomeroy, Eq. Jur. (2d Ed.) § 1053.

The trust relation between the managers and beneficiaries of an eleemosynary or benevolent corporation has often been declared and enforced by the courts, as notably in Watson v. Jones, 13 Wall. 679, and has also been distinctively applied to the beneficiaries of cemetery organizations. 2 Perry, Trusts, §§ 706, 707, and cases cited; Hullman v. Honcomp, 5 Oh. St. 238; Stockton v. Mayor, supra; Houston v. Drew, 13 Tex. Civ. App. 536, 36 S. W. 802.

Recurring again to the provisions of c. 34, tit. 3, supra, we find a positive recognition, in terms, of such trust relation. Remembering that, at the time cemetery associations were included in title 3, colleges and seminaries were the important subject of such title, it is significant that the managers of such last-named institutions are spoken of in provisions defining their powers as "the trustees of any college or seminary incorporated under the provisions of this title." G. S. 1894, § 2923. The reference to trustees

in this section is so used as seemingly to imply that the persons having the authoritative management of any association recognized in such title are trustees. The existence of the trust relation does not, however, depend on questions of nice construction, but upon equitable considerations of the broadest character. Such relation does not necessarily follow from the use of definitions in the statutes, or in the instrument creating it. It is not a question whether a right has been correctly designated as a "trust," but whether it in fact is so, by reason of the confidential situation of the parties. This has been best expressed by the highest court in the land in these words: "Every person who receives money to be paid to another, or to be applied to a particular purpose, to which he does not apply it, is a trustee." Taylor v. Benham, 5 How. 233.

If the fiduciary character of the benevolent corporations provided for in the revision of 1866, by title 3, impresses the trust relation upon their governing bodies, it may have furnished a reason for the inclusion of "cemetery associations" therein by the amendment of 1872. We must, upon elementary grounds, presume that the legislature, for a wise and judicious purpose adopted this amendment, and not conclude that this was done to encourage private schemes of speculation and profit, against our state policy. We find that G. S. 1866, c. 34, tit. 5, relates solely to cemetery organizations, containing full and specific rules for their creation and government, with many provisions extended at length for the holding of meetings, and the participation of lot owners in the direction and conduct of the corporation; hence it seems very probable that the amendment of 1872 was enacted to avoid much of what may have been considered the unnecessary minutiæ and detail provided for in title 5, as well as to accomplish the general beneficial results therein provided for by the creation of a more composite body to execute the trust.

Having reached the conclusion that the nature of the uses of the Maplewood cemetery was public, that the lot owners were the beneficiaries, that a dissolution of the corporation was not contemplated, and that a trust was impressed upon the corporation to conduct the same for its appropriate uses, it remains only to consider the position of the respondents that the beneficiaries

cannot maintain their action, but a suit for the misuse of its franchise must be brought in the name of the state to dissolve the corporation. This is purely an obstructive theory, for it practically denies any remedy to the complainants, although they have suffered actual wrongs while acting in reliance upon the declarations of the trustees, who now deny that there is a trust, as well as the right of the beneficiaries to an accounting. If this claim is sound, the result follows that the beneficiaries are remediless.

The argument for respondents is put in this way:

If the nature of the cemetery use was public, under its organization, the misuse of the franchise was a public injury, and can only be redressed by a suit to dissolve the corporation, and oust the members from exercising any rights in the same; and such a suit can only be maintained by the attorney general in the name of the state, and not at the complaint of a private individual. This is plausible, but sophistical and unsound, upon obvious principles of natural justice; for if the lot owners, by the conduct of the defendants, are suffering an injury peculiar to each individually, they ought not to be relegated for relief to the public law officers of the state, when they should have the same as a right. The grief-stricken parent who has buried a child, and the husband or wife mourning for the loss of a spouse, are much more interested in the remains of the deceased than even the sympathizing friends who attend the funeral, and decidedly more than the general public. While there is no property, in a commercial sense, in the remains of the dead, yet there is a valuable right to secure its decent burial, and protection from the violation of the grave afterwards. Pierce v. Proprietors, 10 R. I. 227; Larson v. Chase, 47 Minn. 307, 50 N. W. 238.

It is, indeed, very seriously to be questioned whether a suit by the attorney general to dissolve the franchise would be entertained at the request of private parties suffering individual wrongs. At all events, it would be within his discretion to bring it or not; and if we were to deny jurisdiction in such a case, and the attorney general should, as he might, refuse his assistance, we could not but justify the indignation of the injured party who should turn upon us with the protest that our claim to administer justice was

85 M.—33

but a solemn mockery, and say: "You have told us we have a remedy, you have admitted that we have been wronged in a matter affecting our deepest interest in this world, but you tell us you can afford no relief, and we cannot find it elsewhere. We have asked for bread, and you give us a stone." But, after all, a dissolution does not help the lot owner. It is clearly to his interest to have the corporate entity continue for the protection of his rights. As we have seen, those rights are perpetual; hence a dissolution of the corporation at the suit of the state would give him no adequate remedy. It would, in fact, aid the wrongdoer to retain the money he has converted.

But the question thus presented is not longer open to contention, for by an unbroken line of authority an individual who has suffered from an intrusion upon a public right which affects him in peculiar and individual respects, and in a different degree from the general public, is entitled to the cognizance of a court of equity to redress his private wrongs. 2 Story, Eq. Jur. (13th Ed.) §§ 920–923; Attorney General v. Chicago, 35 Wis. 425, and particularly pages 530 to 534, inclusive, containing an extensive citation of authorities. The very origin of equity in Rome and in England was that there was never a wrong for which there was no remedy, or no adequate relief at law. 1 Story, Eq. Jur. (13th Ed.) §§ 49, 50. Lord Cottenham, in Wallworth v. Holt, 4 Mylne & C. 619, 635, says: "I think it the duty of this court to adapt its practice and course of proceeding to the existing state of society, and not, by too strict an adherence to forms and rules established under different circumstances, to decline to administer justice and to enforce rights for which there is no other remedy.  *  *  *  If, therefore, it were necessary to go much further than it is in opposition to some highly sanctioned opinions in order to open the door of justice in this court to those who cannot obtain it elsewhere, I should not shrink from the responsibility of doing so." Quoted in 1 Story, Eq. Jur. (13th Ed.) § 671, note.

The jurisdiction of courts of equity to give adequate relief to aggrieved parties in cases where mortuary rights are violated has been most thoroughly considered in Pierce v. Proprietors, supra. The court in that case held that while a dead body is not property,

in the strict sense of the common law, it is a quasi property, over which the relatives of the deceased have rights which the courts will protect, and that the persons having charge of the remains after burial may have the assistance of equitable remedies to enforce such rights. In that case, as in this, it was claimed that the law afforded no relief; and, appropriate to the contention here, that court held (page 240), in the language of Potter, J., that:

"It has been the boast of many of the sages of the law that there is no wrong without a remedy. Says Lord Coke (Co. Litt. 197b; 1 Thom. Co. Litt. 902), 'The law wills that, in every case where a man is wronged and endangered, he shall have a remedy.' Lord Holt, in Ashby v. White: 'If the plaintiff has a right, he must of necessity have a means to vindicate and maintain it. * * * It is a vain thing to imagine a right without a remedy.' 2 Ld. Raym. 938, 6 Mod. 45; judgment of Lord Holt in Ashby v. White, 1 Smith, Lead. Cas. *342, *346. And see Lord Abinger's interpretation of the old maxim, 'Boni judicis est ampliare jurisdictionem.' And the late C. J. Ames has well expressed it in his opinion in the case of Reynolds v. Hoxsie, 6 R. I. 463, 468,—that it is perfectly understood that there cannot be a wrong, under our jurisprudence, for which the law does not, in some form, provide a remedy."

In Beatty v. Kurtz, 2 Pet. 566, 584, which was to obtain an injunction to prevent the removal of tombs and graves, Judge Story, in giving the opinion of the United States supreme court, says: "It is a case where no action at law * * * would afford an adequate and complete remedy. * * * The remedy must be sought, if at all, in the protecting power of a court of chancery, operating by its injunction to preserve the repose of the ashes of the dead, and the religious sensibilities of the living." In cases like the present no common-law action could avail much. The owner of the lot might have trespass, but he could only recover damages in money. He might have an action of detinue for the body, or so much earth, etc., taken away, or, perhaps, might have replevin; if buried by permission on another's land, it might, perhaps, be considered a license or easement, for disturbance of which the person who procured the burial might have an action; but it is easy to see that neither form of action affords a sufficient remedy,

or could with any certainty restore the body to the proper custody. Equity only can give a full and complete remedy, and we think the jurisdiction is fully adequate to it.

Much reliance is placed by counsel for respondents upon Bourland v. Springdale, 158 Ill. 458, 42 N. E. 86, in which relief similar to that sought in this case was denied. The Illinois association was incorporated under a special charter, afterwards made a public act, in which a certain sum of money was set aside for the purpose of improving a cemetery. The bill of complaint in that case did not allege that this improvement fund had been misappropriated or diverted, and the court denied relief because it did not appear but that such fund had not been applied as provided by law; hence that it did not follow that a trust obligation had been violated. We think it appears, impliedly, at least, from that opinion, that, if the part of the funds to be appropriated for improvement had been diverted, the suit would have been maintainable. To this extent that authority sustains the contention of the plaintiffs in this case, for it is distinctively set forth in the complaint here that trust funds which should have been appropriated to the improvement of the cemetery have been wrongfully converted and misapplied; and we are unable to follow that able opinion in all respects, although the result does not, in our judgment, conflict with the conclusions we have reached.

In a recent action in the court of civil appeals in Texas by a shareholder and lot owners who were not shareholders, where it was shown that the defendant had failed to maintain the cemetery in a proper condition, and had wrongfully misapplied the trust fund provided by the charter for the purpose of improving the cemetery, it was held to be within the discretion of the court to appoint a receiver, with special authority to continue the business of the association, and to make all expenditures necessary to maintain the cemetery in a reasonable state of preservation. Houston Cemetery Co. v. Drew, 13 Tex. Civ. App. 536, 36 S. W. 802. This decision is of great weight, as it bears upon the particular relief sought here. The learned chief justice in delivering the opinion uses this language: "The defendant company, whether as a quasi-public corporation, or one strictly private, owes duties to its

lot owners and shareholders, which it may be compelled by the courts to perform; and from the nature of its business, and the matters of neglect and breaches of duty charged against it in misappropriating the trust fund, and failing to collect the assessments and to keep the bridge [in the cemetery] in repair, this seems to be a proper case for the appointment of a receiver, with all the power conferred upon him by the order appealed from.   *   *   *   There can scarcely be any doubt that a lot owner in a cemetery corporation has such an interest therein as may be protected in a proceeding of this kind.   He is not the ordinary owner of an easement, and his right to have the drives, walks, and approaches kept in repair does not depend upon the law of easements."

The claim that the cemetery has not been properly improved by the setting out of trees and appropriate embellishments therein might not, alone, without more specific allegations in that respect, justify an examination into the conduct of the members and directors of the Maplewood Cemetery Association; for while public authorities now embellish their cemeteries with trees, shrubs, and flowers, which are often more appropriate to places for the repose of the dead than costly tombs and monuments, yet a latitude of judgment must be left to the trustees in the exercise of this duty, and if it has been wrongfully disregarded, in violation of public taste, judgment, and necessity, in a proper case, it might be cause of inquiry; yet we do not place our decision distinctively upon that ground, but to the right of an investigation by the court, which in this case is sufficient upon its authority to order an accounting between the trustees and their beneficiaries.   An accounting is peculiarly within the jurisdiction of a court of equity. 1 Story, Eq. Jur. (13th Ed.) § 465.   It may be stated generally that, whenever there is a fiduciary relation between a trustee and his beneficiaries, the right to an accounting in equity is based upon the existence of the trust.   1 Enc. Pl. & Pr. 96, and cases cited in note.   See also Clark v. Stanton, 24 Minn. 232; Jones v. Morrison, 31 Minn. 140, 148, 16 N. W. 854.

Finally we find that there has always existed in our statute of uses and trusts (G. S. 1894, c. 43) power to appoint a new trustee in place of one "deceased, released, or removed," and that the

courts may appoint such new trustee, or cause the trust to be executed by one of its officers under its direction (section 4300), and that such power may be exercised whenever it becomes necessary to insure a lawful performance of the trust.

Upon the authorities and reasons above considered, we hold that the denial of the trust relation by respondents and the alleged misappropriation of its funds justify equitable interference by the court to compel a fair and accurate showing of the management of the corporation by respondents, and give jurisdiction to the court to make the necessary investigation; and that the court may, if the facts justify further action, under the proper rules of equity, in the exercise of judicial discretion and judgment, grant such further relief as the nature of the trust in the proper management of the cemetery requires.

The order sustaining the demurrer is reversed, and the cause remanded for further proceedings in conformity with the views above expressed.