STATE of Minnesota, by its Attorney General, Hubert H. HUMPHREY, III, Appellant,

v.

DELANO COMMUNITY DEVELOPMENT CORPORATION, Respondent.

No. C6–96–1376.

Supreme Court of Minnesota.

Dec. 11, 1997.

Hubert H. Humphrey, III, Minnesota Attorney General, Cecilia Krettek Morrow, Assistant Attorney General, St. Paul, for Appellant.

Patrick J. Neaton, Chamberlain, Neaton & Johnson, Wayzata, for Respondent.

## OPINION

ANDERSON, Justice.

Thirty-one years ago, five members of the Lions Club in Delano, Minnesota decided to form an economic development corporation to encourage business development in their community. These community leaders incorporated respondent Delano Community Development Corporation (DCDC) as a for-profit business corporation to spearhead a long-term plan to create jobs in Delano and expand the city's tax base. DCDC was very successful. Between 1966 and 1994, the efforts of its incorporators and shareholders yielded 12 new businesses in the city, over 500 new jobs, and millions of dollars in increased property values. In 1994, DCDC shareholders voted to dissolve the corporation and distribute its assets, including incidental profits, to the shareholders. They notified the attorney general of their intent to do so. The State of Minnesota, through its attorney general, brought an action in Wright County District Court seeking to prevent distribution of any profits to DCDC shareholders and to impose a charitable trust on the corporation's assets. The district court granted DCDC's motion for summary judgment, holding that DCDC operates as a for-profit corporation and that it "does not operate as a charitable trust." On appeal, the Minnesota Court of Appeals affirmed. We affirm.

A catalyst for the formation of DCDC was the availability of community economic development loans from the Small Business Administration (SBA). Beginning in the early 1960s, the SBA offered loans to community development organizations for up to 80% of the financing for an eligible development project. *See* 13 C.F.R. § 108.502–1(e) (1963). The SBA allowed either nonprofit or for-profit development corporations to participate in the loan program, so long as the entity's primary goal was to benefit the community. *Id.* § 108.2(d)(1)-(2). The founders originally envisioned DCDC as a nonprofit corporation so that the organization would not have to use any of its development funds to pay income taxes. One of the first projects the group planned was to build a nursing home. They hoped to use an SBA loan for 80% of the financing and then issue subordinated debentures for the balance. DCDC's counsel, however, advised the group that a nonprofit corporation could not issue the subordinated debentures necessary to complete the financing for the nursing home. As a result, the founders decided to incorporate DCDC as a for-profit corporation under the existing Minnesota Business Corporation Act, Minn.Stat. ch. 301 (1965).

On April 7, 1966, 27 business people and citizens of Delano formally incorporated DCDC. Article 4.1 of the corporate articles outlined DCDC's purpose as:

> 4.1) The general purpose and nature of its business shall be for the purpose of furthering the economic development of Delano and vicinity; to aid, assist and promote the growth, expansion and development of business concerns, including small business concerns in said area; to encourage and assist in the location of new business and industry, rehabilitate and assist existing business firms and industry in said area; to accomplish these purposes by making plant and other facilities available to all such business concerns through lease or other means and thereby to contribute to the economic well-being of the area as measured by increased employment, payroll, business volume and corresponding factors rather than monetary profits to the shareholders. *Any monetary profits or other benefits which flow to shareholders shall be merely incidental thereto.*

(Emphasis added.) To capitalize the corporation, the 27 incorporators, as well as members of the Lions Club, sold common shares in 50–share blocks for $1.00 per share. In addition to the 27 incorporators, approximately 65 other area residents purchased 50 shares each as an investment in their community's future.[1]

---

**1.** There is some dispute in the record as to precisely how many shareholders DCDC has. A letter to shareholders reporting on the 1995 Annual Meeting lists a total of 101 50–share blocks as of August 1, 1995: 91 voting shareholders, eight 50–share blocks owned by the corporation, and two other 50–share blocks about which the corporation has no information. A 1993 infor-

DCDC's records reveal that it succeeded in its endeavor to bring new businesses to the community. By the late 1960s, DCDC had promoted and developed not only the Delano Manor Nursing Home, a 66–bed long-term care facility, but also Air Control Products, a new manufacturing plant with 19 employees. More recently, DCDC developed a 70–acre industrial park containing 12 businesses, which provided 439 full-time jobs. Representative businesses located in the industrial park as of 1994 were a playground equipment manufacturer employing 160 people and a direct mail service with 60 employees. As of 1994, the efforts of DCDC shareholders had created 511 new jobs in Delano and had developed businesses with a combined market valuation of just under $10 million.

Although DCDC's economic development projects flourished, the corporation's income tax payments often constituted a significant financial hardship. As a result, in 1991 DCDC's board of directors decided to form a nonprofit economic development corporation to preclude state and federal income tax liability on community development projects. Accordingly, they incorporated Economic Development Corporation of Delano (EDCD) as a nonprofit corporation and subsequently received tax-exempt status from the IRS. In 1993, the DCDC board proposed to fund EDCD by transferring substantially all of DCDC's assets to the new nonprofit corporation. One DCDC board member opposed the resolution and voted not to approve the asset transfer because he saw no reason to dissolve DCDC when it had been so successful. Nonetheless, the board approved the asset transfer by a vote of 7–1 and then submitted the issue for a shareholder vote at a special shareholders meeting in June 1993.

At the special shareholders meeting, significant objections emerged to the plan for DCDC to transfer its assets to EDCD. Thirty-nine DCDC shareholders filed notice of intent to assert dissenting shareholders' rights if the asset transfer were approved. These shareholders, joined by the dissenting

board member, believed strongly that DCDC should be dissolved and its assets distributed to each shareholder. At the meeting, the dissenting shareholders argued that because their initial purchase of shares had been an investment rather than a donation, individual shareholders should be allowed to choose whether to donate money to the new nonprofit corporation. The 39 dissenting shareholders were counted as votes against the asset transfer, and the motion was defeated.

In September 1994, the DCDC shareholders voted to dissolve the corporation by a 57–4 vote. DCDC notified the State of Minnesota on October 7, 1994 of its intent to dissolve and distribute assets to shareholders. The amount to be distributed was a significant increase over each shareholder's initial $50 investment.[2] The attorney general replied by letter, stating that DCDC was prohibited from distributing its assets to shareholders beyond the initial $50 paid for each 50–share block. The attorney general also stated that should the corporation dissolve, it must use or distribute its assets consistent with its charitable purposes. In response, DCDC shareholders voted in 1995 to withdraw the notice of dissolution and to amend the corporation's articles. The proposed amendment deleted the original language of Article 4.1 and substituted a revised statement of purpose, which read, "[t]he purposes for which this Corporation is organized are general business purposes." The notice of dissolution was withdrawn in July 1995. A DCDC board member stated that because this litigation generated uncertainty about the corporation's status, the proposed revision to the articles was never filed. As of the date of this action, DCDC continues to act as an economic development organization, although a board member has expressed concern that the litigation has curtailed the organization's ability to make long-term financial commitments.

Following the attorney general's notice to DCDC that he believed it operates as a

---

mation sheet accompanying a proxy and notice of a special shareholder meeting lists 104 original shareholders.

**2.** As of December 31, 1994, DCDC had total assets of $155,499 and total liabilities of $27,503. A member of DCDC's board stated that the corporation's net worth in January 1996 was approximately $100,000.

charitable trust, the state filed a complaint in Wright County District Court seeking, among other things, a declaratory judgment that DCDC's assets are held in trust for the economic development and well-being of Delano and that DCDC is a nonprofit corporation; an injunction preventing DCDC and its officers and directors from distributing any of its assets to shareholders; and an injunction removing DCDC's officers and directors and authorizing the appointment of new officers and directors, or alternatively ordering the dissolution of DCDC and the distribution of its assets for the charitable purposes to which the funds are dedicated. After discovery, both parties moved for summary judgment. The district court denied the state's motion and granted DCDC's motion, concluding that DCDC is a for-profit corporation and thus the state does not have the authority to bring an action against it under either the Minnesota Nonprofit Corporation Act, Minn. Stat. ch. 317A, or the Minnesota Supervision of Charitable Trusts and Trustees Act, Minn.Stat. §§ 501B.33–501B.45. Holding that DCDC's articles of incorporation are unambiguously those of a for-profit corporation, the court of appeals affirmed the district court's decision.

On appeal, the state argues that the definition of a charitable trust must be liberally construed; that DCDC's articles establish that its purpose is the charitable pursuit of economic development and that shareholders may not receive profits; and that the conduct and activities of DCDC since its incorporation require that DCDC hold its assets under a fiduciary duty to use them for economic development.

## I.

■ We must decide whether, as a matter of law, DCDC is a for-profit corporation whose articles of incorporation unambiguously contemplate that shareholders may receive monetary profits incidental to the corporation's primary purpose of furthering the community's economic well-being. Summary judgment is appropriate when there is no genuine issue as to any material fact and either party is entitled to judgment as a matter of law. Minn. R. Civ. P. 56.03.

When reviewing a summary judgment decision, this court must determine whether there are any genuine issues of material fact and whether the lower courts erred in their application of the law. *Bol v. Cole*, 561 N.W.2d 143, 146 (Minn.1997). Questions of law, including the determination of whether a writing is ambiguous, are reviewed de novo. *Cut Price Super Mkts. v. Kingpin Foods, Inc.*, 256 Minn. 339, 354, 98 N.W.2d 257, 268 (1959). Evidence must be construed in the light most favorable to the party against whom summary judgment was granted. *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn. 1993).

■ A corporations's articles of incorporation embody a contract between the state and the corporation, as well as among the shareholders. *Midland Coop. Wholesale v. Range Coop. Oil Ass'n*, 200 Minn. 538, 540, 274 N.W. 624, 625 (1937). Corporate articles are therefore interpreted using the same rules of construction applied to contracts. *See Leslie v. Minneapolis Teachers Retirement Fund Ass'n*, 218 Minn. 369, 373–74, 16 N.W.2d 313, 315–16 (1944). The determination of whether a contract, such as a corporation's articles, is ambiguous is a question of law. *See Current Tech. Concepts, Inc. v. Irie Enterprises, Inc.*, 530 N.W.2d 539, 543 (Minn.1995).

■ A recitation in the articles of incorporation that an organization is organized under a particular statute is not dispositive; instead, a corporation's statement of purpose in its articles determines the corporation's true nature. *International Boom Co. v. Rainy Lake River Boom Corp.*, 97 Minn. 513, 519, 107 N.W. 735, 737 (1906). DCDC's articles state that it was organized under the existing Minnesota Business Corporation Act, Minn.Stat. ch. 301. Article 4.1 announces that the corporation's purpose is to "further[ ] the economic development of Delano and vicinity." The articles also clearly anticipate that DCDC shareholders may receive profits from the corporation's transactions. Specifically, the last sentence of Article 4.1 declares, "[a]ny monetary profits or other benefits which flow to shareholders shall be merely incidental thereto." The state argues that the limita-

tion in Article 4.1 on profit flowing to the shareholders as "merely incidental" prohibits DCDC from distributing any monetary profits to shareholders. We disagree. Interpreting "incidental" to mean or imply prohibited is incongruent with the plain meaning of "incidental," its definition in legal dictionaries, usage in opinions of this court, and in opinions of the attorney general.

The state cites *Black's Law Dictionary* as evidence that the use of "incidental" to modify profits means that such profits are not permitted. Yet *Black's* defines "incidental" as "[d]epending upon or appertaining to something else as primary; something necessary, appertaining to, or depending upon another which is termed the principal." Henry Campbell Black, *Black's Law Dictionary* 762 (6th ed.1990). Garner's *A Dictionary of Modern Legal Usage* contains a similar definition: "happening by chance and subordinate to some other thing; peripheral." Bryan A. Garner, *A Dictionary of Modern Legal Usage* 430 (2d ed.1995). Likewise, *The American Heritage Dictionary* defines "incidental" to mean "[o]ccurring or likely to occur as an unpredictable or minor accompaniment" or "of a minor, casual, or subordinate nature." *The American Heritage Dictionary of the English Language* 912 (3d ed.1992). None of these definitions asserts or implies that something incidental is prohibited. The state's contention that incidental profits are disallowed profits simply does not square with *Black's*, the authority it cites for support. Both Garner's *A Dictionary of Modern Legal Usage* and *The American Heritage Dictionary* are consistent with *Black's*.

The state does not point to any cases in which this court has used the term "incidental" in the way it now urges on the court. It cites *Lowry v. City of Mankato*, apparently to support its interpretation. 231 Minn. 108, 42 N.W.2d 553 (1950). In *Lowry*, however, the court noted that " '[i]ncidental' has much the same meaning as 'accessory' and 'subordinate' and is used to convey the idea of a thing being subordinate to, dependent on, and pertaining to another thing which is the principal one." *Id.* at 114, 42 N.W.2d at 558.

This definition clearly tracks the definition of "incidental" in *Black's*, and it is fully congruent with those in Garner's *A Dictionary of Modern Legal Usage* and *The American Heritage Dictionary*.

A 1977 attorney general opinion used "incidental" as the term is commonly understood. Op. Att'y Gen. No. 707a–15, at 660 (Dec. 23, 1977). In responding to a question about a city's obligation to advertise for bids for trash collection, the attorney general wrote, "[a]lthough an element of maintenance [of property] may be *incidentally* involved, the primary objective a city is presumed to have in contracting for refuse collection * * * is * * * the protection of public health." *Id.* (emphasis added). Certainly, the attorney general did not seek to declare in this opinion that property maintenance was a *prohibited* aspect of trash collection, but instead that it was secondary or subordinate to the principal goal of maintaining public health. *See also* Op. Att'y Gen. No. 469A–15, at 613 (Aug. 29, 1978) (same usage of "incidental"). The everyday meaning of "incidental," its definition in legal dictionaries, and its usage in judicial and attorney general opinions all indicate that "incidental" profits are contemplated and permitted, not prohibited.

We next look at DCDC's articles of incorporation as a whole to determine whether they contain other provisions that might undermine the articles' express contemplation that shareholders may receive profits. *See Current Tech. Concepts*, 530 N.W.2d at 543. We find no other provision in the articles that limits DCDC's actions as a for-profit corporation. Indeed, the qualification in the articles' purpose clause that DCDC's contribution to Delano's economic well-being be measured by "increased employment, payroll, business volume and corresponding factors rather than monetary profits to the shareholders" expressly contemplates that profits may be distributed to the shareholders. While this qualification suggests that profit is not DCDC's primary goal, it in no way prohibits the shareholders from realizing profit. The articles do not contain any restrictions on the distribution of dividends, profits, or any money or property to the shareholders,

nor do they restrict the transfer of shares of capital stock as to either number or amount.

The lack of constraint on DCDC's ability to accumulate and distribute incidental profits stands in stark contrast to the restrictions contained in the corporate articles discussed in *In re Red River Valley Livestock Ass'n,* 235 Minn. 267, 50 N.W.2d 287 (1951), a case on which the state and the dissent rely heavily to support imposition of a charitable trust on DCDC. The Red River Valley Livestock Association had incorporated as a for-profit entity with a 30–year duration; at the end of the 30–year period, the shareholders petitioned the court for an order dissolving the corporation and distributing its assets. *Id.* at 267–68, 50 N.W.2d at 287–88. The association's articles of incorporation, however, expressly prohibited the corporation from making a profit. The articles provided that " '[t]he corporation shall be nonpolitical and shall engage in no business for pecuniary profit.' " *Id.* at 269, 50 N.W.2d at 288. Because the articles prohibited the organization from engaging in profit-making activity, the court determined that the association was not a for-profit corporation at all. *Id.* at 270–71, 50 N.W.2d at 289. Therefore, the court held that the shareholders' attempt to dissolve the corporation was invalid. *Id.* at 271, 50 N.W.2d at 289.

Although the dissent implies otherwise, the court in *Red River Valley* did not conclude that the Red River Valley Livestock Association was nonprofit based on its interpretation of the articles' purpose clause. Instead, the decision turned on the conflict between the provision in the articles prohibiting pecuniary profit and the association's incorporation under the for-profit business corporation statute. *Id.* at 269, 50 N.W.2d at 288. The court did not address the validity of the dissolution and distribution of assets of a corporation whose articles expressly contemplate shareholder profits. The corporate articles of the Red River Valley Livestock Association are not analogous to those of DCDC, and thus the court's decision in *Red River Valley* does not dictate the outcome in this case.

The internal consistency of and lack of ambiguity in the DCDC articles lead us to conclude that DCDC is indeed a for-profit corporation. Further, we conclude that DCDC's articles of incorporation unequivocally anticipate that shareholders may receive a distribution of profits from the corporation's economic development activities. Because we conclude that the articles are unambiguous, there is no need to turn to extrinsic evidence to determine their intent. We hold that DCDC is a for-profit corporation that may distribute profits to its shareholders.

## II.

■ The state asks this court to impose a charitable trust on DCDC's assets to prevent distribution of profits to its shareholders and to hold funds in trust solely for economic development activities in Delano. In so doing, it seeks to exert its authority over community economic development organizations in an unprecedented way. Not only would such a result contradict firmly established principles of contract interpretation, but it would potentially have profound repercussions for for-profit community development corporations throughout Minnesota. *See State v. Delano Community Dev. Corp.,* No. C9–95–1862, slip. op. at 3 (Minn.Dist.Ct. Apr. 3, 1996) (finding that "DCDC is akin to other community development corporations which operate as for profit corporations").

The state cites a variety of cases, including some from other jurisdictions, that conclude that a corporation whose purposes are charitable holds its assets subject to a charitable trust. *See, e.g., Lynch v. Spilman,* 67 Cal.2d 251, 62 Cal.Rptr. 12, 431 P.2d 636 (1967); *City of St. Louis v. Institute of Med. Educ. and Research,* 786 S.W.2d 885 (Mo.Ct. App.1990); *Attinson v. Consumer–Farmer Milk Coop.,* 197 Misc. 336, 94 N.Y.S.2d 891 (1950). None of the cases the state relies on, however, presents a fact situation analogous to that of DCDC. In none of the cited cases did the state seek to impose a charitable trust on the assets of an unambiguously for-profit corporation: one whose articles contemplate explicitly the distribution of profits to shareholders and contain no contradictory or undermining provisions. We recognize that the state has pursued this action with the highest of motives—the pro-

tection of the economic well-being of Delano and its citizens. Nonetheless, we cannot allow the state to impose a charitable trust on DCDC's assets in order to prevent the corporation's distribution of incidental profits to its shareholders when DCDC is a for-profit corporation whose articles explicitly permit such a distribution.

Affirmed.

GARDEBRING, Justice (dissenting).

I respectfully dissent. While I agree with the legal principles articulated by the majority in this case, I would reach the opposite conclusion. My examination of the record before us persuades me that DCDC's declared purpose and historical conduct plainly demonstrate that it is a nonprofit corporation and, therefore, that its assets may not legally be distributed to its shareholders.

This case calls upon us to determine the legal nature of DCDC. If DCDC is, as the majority states, a corporation formed for-profit, the shareholders have the power under law to dissolve the corporation and distribute the assets, consistent with its articles of incorporation, after payment of outstanding liabilities. Minn.Stat. §§ 302A.721–.725 (1996). A nonprofit corporation, however, may not dissolve and distribute its assets to its members or shareholders. Minn.Stat. § 317A.735, subd. 2 (1996) provides that "[a]ssets of the [nonprofit] corporation may not be diverted from the uses and purposes for which the assets have been received and held, or from the uses and purposes expressed or intended by the original donor." *See also* Minn.Stat. § 317A.011, subd. 6 (1996).

In construing the nature of an organization, we begin with the statute under which the entity purports to be incorporated. As the majority has correctly observed, however, a recitation in the articles of incorporation of the organization's statutory basis is not dispositive if the identified statute appears to be inconsistent with the purpose of the organization as expressed by its articles of incorporation. *State ex rel. Clapp v. Minnesota Thresher Mfg. Co.*, 40 Minn. 213, 222, 41 N.W. 1020, 1023 (1889). A corporation's statement of purpose as contained in its arti-

cles, if unambiguous, determines the true nature of the corporation. *International Boom Co. v. Rainy Lake River Boom Corp.*, 97 Minn. 513, 519, 107 N.W. 735, 737 (1906).

A corporation's articles are interpreted using the same rules of construction as a contract; if the meaning is unambiguous, the court will not look beyond the writing. *Noreen v. Park Constr. Co.*, 255 Minn. 187, 190, 96 N.W.2d 33, 36 (1959). However, legal documents, including articles of incorporation, are ambiguous if they are susceptible to more than one construction. *Republic Nat'l Life Ins. Co. v. Lorraine Realty Corp.*, 279 N.W.2d 349, 354 (Minn.1979). If the articles are ambiguous, the court next turns to extrinsic evidence to determine their intent. *Donnay v. Boulware*, 275 Minn. 37, 44, 144 N.W.2d 711, 716 (1966). The "practical construction" given the articles by the dealing and conduct of the corporation may be considered as evidence of the meaning. *Leslie v. Minneapolis Teachers Retirement Fund Ass'n*, 218 Minn. 369, 374, 16 N.W.2d 313, 316 (1944).

We begin, then, with the statute under which DCDC was formed. DCDC was incorporated under the then-current Minnesota Business Corporation Act, Minn.Stat. ch. 301 (1965). However, since our 1899 decision in *Clapp*, this court has consistently held that the nature of a corporation is determined by the purpose stated in its articles of incorporation, rather than by the label attached to it by its articles or the statute under which it purports to be incorporated. *See, e.g., International Boom*, 97 Minn. at 519, 107 N.W. at 737. DCDC's incorporation under the statute governing for-profit corporations does not make DCDC for-profit if its articles indicate a purpose inconsistent with a for-profit organization. *In re Red River Valley Livestock Ass'n*, 235 Minn. 267, 271, 50 N.W.2d 287, 289 (1951).

Therefore, we must turn our examination to DCDC's articles of incorporation which state unambiguously that the organization's purpose is to further the economic development of Delano and vicinity. The articles further state that such economic well-being is to be "measured by increased employment,

payroll, business volume and corresponding factors *rather than monetary profits* to the shareholders." (Emphasis added.)

This recitation of purpose closely resembles that of the Red River Valley Livestock Association, the subject of an earlier case addressing the same type of issue. There, the Association was organized for "the improving of [livestock] and to aid, assist and encourage the raising, * * * selling and developing of [livestock] and poultry * * * and the promotion of the general welfare of said territory." *Red River Valley*, 235 Minn. at 269, 50 N.W.2d at 288. In that case, this court held that the association more closely resembled a nonprofit corporation than a for-profit corporation and disallowed the shareholders from dissolving the corporation and distributing its assets among themselves. *Red River Valley*, 235 Minn. at 270–71, 50 N.W.2d at 289.

Similarly, economic development of a city necessarily benefits the residents of the city and its environs. Insofar as the benefits which flow to the shareholders (almost all of whom are also residents of Delano) are the same as those flowing to the general public, "increased employment, payroll, business volume," and the like, the purpose of DCDC is more consistent with a nonprofit corporation than a for-profit business.

A for-profit corporation, on the other hand, may be incorporated under the Business Corporation Act "for any business purpose." Minn.Stat. § 302A.101 (1996). A for-profit business corporation is generally intended to financially benefit the shareholders of the corporation. 18 Am.Jur.2d *Corporations* § 32 (1985). In this case, however, DCDC's articles of incorporation clearly express a purpose to benefit the community of Delano in general, and not the shareholders specifically. Indeed, the measure of success in meeting the stated objective of benefiting the community specifically excludes "profits to the shareholders." It is hard to imagine a more precise rejection of profitmaking as a purpose!

In addition to the explicit nonprofit intent spelled out in the statement of purpose, other language in the articles of incorporation further supports the notion that DCDC is a nonprofit organization by requiring that any monetary profits shall be "merely incidental" to DCDC's purpose. The majority interprets "incidental" to mean "secondary" or "peripheral," which is, admittedly, part of the common definition. The majority disregards, however, that "incidental" equally encompasses the idea of something that is "minor" and "insignificant." *The American Heritage Dictionary of the English Language* 912 (3d ed.1992); 20A *Words and Phrases*, "Incident; Incidental" (1959). I would hold that a return of 2000% or more on an initial investment of $50, as proposed by the shareholders who voted to dissolve DCDC, is not "merely incidental" to the purpose of DCDC as stated in its articles.

Based on these provisions, I would hold that the DCDC articles of incorporation unambiguously prohibit profit-taking by shareholders seeking to reap a personal financial reward, contrary to the avowed purpose of the organization.

However, even assuming there is some ambiguity in the articles concerning the corporation's purpose, extrinsic evidence provided by the pattern and history of conduct of DCDC further illuminates the drafters' intent and makes clear that DCDC was, from its inception, conceived of and operated as a nonprofit organization. The evidence of DCDC's corporate actions throughout its history is consistent with a nonprofit purpose and inconsistent with a for-profit purpose. I note first the facts surrounding the creation of DCDC: a group of Delano businessmen wanted to improve the Delano economy and to benefit the overall community by bringing more business and industry to town. Further, the operation of the DCDC prior to the dispute that led to this litigation is also consistent only with a charitable purpose: DCDC has never paid its shareholders any dividends during its 30–year history and its directors and officers never received compensation, but conducted all the work of the corporation on a volunteer basis. It is also undisputed that DCDC shares were always purchased and transferred in the original 50–share blocks at the issuance price of $1.00 per share, rather than trading at market value. Indeed, there is no evidence on the

record that the corporation engaged in any profit-making activity. Only after the completion of one of the corporation's development projects left a balance of approximately $150,000 in DCDC's coffers did a group of shareholders decide to dissolve the corporation and distribute its assets. The history and practice of DCDC's conduct for the previous 30 years confirm the proposition that the purpose of the corporation has always been a charitable purpose, inconsistent with a for-profit corporation.

Since I would hold the purpose of DCDC to be charitable rather than profitmaking, I would also conclude that DCDC cannot dissolve as a corporation and disburse its assets to the shareholders. Currently, most nonprofit corporations incorporate under the Minnesota Nonprofit Corporation Act, Minn. Stat. ch. 317A (1996). Under that act, the "[a]ssets of the [nonprofit] corporation may not be diverted from the uses and purposes for which the assets have been received and held, or from the uses and purposes expressed or intended by the original donor." Minn.Stat. § 317A.735. Further, the act also provides that nonprofit corporations are prohibited from paying dividends or pecuniary gain to members (other than members that are nonprofit organizations). Minn.Stat. § 317A.011, subd. 6. Although DCDC was not formed under this statute, inasmuch as I conclude that it has the characteristics of a nonprofit corporation, I believe the statutory prohibition on distribution of assets to shareholders would apply to DCDC, as well. However, even if the statutory prohibition is inapplicable, our longstanding law on charitable trusts would impose the same limitation.[1]

Under Minnesota law, a charitable trust is defined as a fiduciary relationship with respect to property that arises as a result of a manifestation of an intention to create it and that subjects the holder of the property to an equitable responsibility to manage the property for a charitable purpose. *See In re Quinlan's Estate,* 233 Minn. 35, 42, 45 N.W.2d 807, 811 (1951); Minn.Stat. § 501B.35, subd. 3 (1996).

Charitable purposes generally include "an actual or purported charitable, philanthropic, religious, social service, educational, eleemosynary, or other public use or purpose." Minn.Stat. § 501B.35, subd. 2. Generally, charitable trusts serve a "large shifting class of the public." *Longcor v. City of Red Wing,* 206 Minn. 627, 635, 289 N.W. 570, 574 (1940). A trust to promote the well-being of the members of the community is charitable. Restatement (Second) of Trusts § 374 cmt. f (1959). Thus, it is clear that the purpose enunciated in the DCDC articles of incorporation clearly comes within the meaning of "charitable purpose."

While DCDC is not an express charitable trust, the attorney general has asked this court to impress upon it the legal requirements of a constructive charitable trust in order to protect DCDC's assets from wrongful distribution to its shareholders.[2] This action is in keeping with the legal role of the attorney general, inasmuch as that office is entrusted, both by statute and at common law, with the responsibility of enforcing charitable gifts and trusts which benefit a "large shifting class of the public." Minn.Stat. § 501B.34 (1996); *Longcor,* 206 Minn. at 635, 289 N.W. at 574. In order to ensure that the assets of DCDC are used consistent with its nonprofit purpose, I would adopt the view of the attorney general that DCDC holds its assets subject to a constructive charitable trust and would require that those assets be used consistent with the corporation's purpose, for the economic development and benefit of the citizens of Delano.[3]

1. This outcome would also be consistent with *Brown v. Maplewood Cemetery Ass'n,* 85 Minn. 498, 505–06, 89 N.W. 872, 875 (1902), in which this court determined that an organization with a charitable purpose could not make a profit for its members at the expense of the corporation's intended beneficiaries.

2. A constructive trust is a remedial measure that arises by operation of law to subject the holder of property to an equitable duty to convey it to another where his retention of the property is wrongful and he would be unjustly enriched by it. Restatement (Second) of Trusts § 1 cmt. e (1959).

3. The state cites cases from several other jurisdictions in which courts have impressed a charitable trust on the assets of corporations with charitable purposes. In *Attinson v. Consumer-Farmer Milk Coop.,* 197 Misc. 336, 94 N.Y.S.2d 891, 894 (1950), a milk cooperative similar to the

In summary, I would hold that the DCDC articles of incorporation unambiguously manifest the nonprofit character of the organization, and that any possible ambiguity is removed by reference to the history and conduct of DCDC, indicating that DCDC is a nonprofit organization. In order to protect the charitable character of DCDC's assets, I would impress a constructive charitable trust upon them. I respectfully dissent.

Red River Valley Livestock Association was held to be a charitable association and a charitable trust was impressed on its assets. In Illinois, a nonprofit fire department was prevented from disposing of its assets, which the court held were impressed with a trust. *Riverton Fire Protection Dist. v. Riverton Volunteer Fire Dept.*, 208 Ill. App.3d 944, 153 Ill.Dec. 165, 566 N.E.2d 1015, 1020–21 (1991). While I acknowledge that such cases are not binding on this court, I find their reasoning to be persuasive.