# CUT PRICE SUPER MARKETS v. KINGPIN FOODS, INC.

98 N. W. (2d) 257.

August 7, 1959—No. 37,408.

R. J. *Leonard*, *Irving Clark*, and *Doherty, Rumble & Butler*, for appellant.

H. E. *Cochrane* and *Lipschultz, Altman, Geraghty & Mulally*, for respondent.

NELSON, JUSTICE.

This is an action commenced by Cut Price Super Markets, a partnership, as plaintiff, against Kingpin Foods, Inc., a corporation formerly known as Hillcrest Super Food Market, Inc., as defendant, for the recovery of damages for breach of contract.

The parties to the action entered into a written franchise agreement on December 9, 1949. The agreement was for a period of 10 years and provided for operations to commence not later than July 1, 1950. Plaintiff had operated a number of supermarkets throughout the city of St. Paul prior to December 9, 1949, under the trade name "Cut Price." Its first store was opened in St. Paul in 1926. It owned some of the stores outright and also leased or franchised the name "Cut Price" to others. Milton Cohen and Esther Cohen, as trustees of the Morris Halpern Trust, were at the time the owners of the trade name "Cut Price Super Market" but have since transferred their interest to plaintiff. The party referred to in the agreement as licensor will hereinafter be referred to as plaintiff and the party referred to in the agreement as licensee will hereinafter be referred to as defendant.

What may be considered as the critical provisions of the agreement read as follows:

"5) In consideration of the covenants and agreements of the licensee, the licensor, or its assigns, agrees that during the time that this agreement is in effect, they will include, in all of their advertising of super markets owned by them or licensed by them under the trade name 'Cut Price Super Market', the address of the Hillcrest Market (for the purpose of this agreement the market operated by the licensee on the land above described is often referred to as the Hillcrest Market) designating it in the same manner as they do their other owned or licensed markets.

"6) The licensee agrees that it will have on hand for sale merchandise at the prices advertised in the joint advertising of the parties, and in the event that the item advertised is available only to the licensor, the licensor agrees that it will supply a proportionate share of said merchandise to the licensee at a reasonable price. By proportionate share it is meant that if certain advertised items are scarce or unavailable, that the supply that is available will be apportioned to the stores owned and licensed by the licensor, in proportion to their dollar volume of business.

"7) The licensee agrees that all outside advertising it may undertake as to its own individual market will be subject to the approval of the licensor."

Paragraphs 4 and 15 provide when and under what conditions the licensee may cancel the contract:

"4) WHEREAS, the licensor may in the future form a corporation, which corporation will own the trade name 'Cut Price Super Market' or may transfer said firm and style name to some individual or individuals.

"Now, THEREFORE, IT IS AGREED AND UNDERSTOOD that the rights under this contract shall automatically be assigned to the owner of said trade name, whether it be an individual or corporation and said transferee of the trade name shall take title to said trade name subject to this agreement. Providing, however, that if Milton J. Cohen and Morris Halpern are both out of active management or ownership of the trust, the corporation to whom the trade name may be assigned, or the individuals to whom the trade name may be assigned, then this contract may be cancelled by the licensee upon giving the licensor, or its transferee, ninety (90) days notice in writing of its intention to cancel. The withdrawal of either one of said named parties shall not be a reason for cancellation but the withdrawal of both shall give the licensee the right herein mentioned. In the event the licensee exercises this option, then it must stop using the name 'Cut Price Super Market' in any manner upon expiration of said notice."

"15) The licensee shall have the right to cancel and void this contract on only one condition in addition to par. 4 page 2 and that is, it

may offer the sale of its store to the licensor upon the following terms and conditions:

"The sale of the land at its cost to the original purchaser from the Hillcrest Development Company;

"The building at its construction cost, less the accumulated depreciation to date taken in connection with income tax reports;

"Fixtures at cost less depreciation taken to date of transfer as per income tax reports; and

"Inventory at current market prices with no charge for good will. "That is, the licensee, if it sees fit to terminate this license agreement, must offer for sale to the licensor, the real estate, building, fixtures and stock for sale to the licensor upon the terms above described, and the licensor shall have a period of ninety (90) days in which to accept or reject the offer of the licensee, and if the licensor accepts said offer of the licensee, then the licensee agrees to sell to the licensor upon the terms above stated, and if the licensor does not see fit to purchase the licensee property on the terms above stated, then the licensee may terminate this agreement without any further liability to it, but in the event of said termination, it must cease immediately to advertise said store as a 'Cut Price Super Market', and must not in any way designate it as formerly having been operated under the 'Cut Price Super Market' name, and in that event, the name 'Cut Price Super Market' must in no way appear on the signs, on the building, on the stationery, or in no way whatsoever in connection with the operation of said store."

Plaintiff's predecessors operated a number of grocery supermarkets in the St. Paul area when the agreement was entered into and agreed to supply advertised merchandise to defendant under certain conditions. The agreement provided that the plaintiff was not to open one of its stores or use the trade name "Cut Price Super Market" within a three-mile radius of defendant's store except for certain specified locations.

It was agreed if jointly advertised items of merchandise were scarce and unavailable, and available only to the plaintiff, then plaintiff would make available to defendant a proportionate share of such merchandise —proportionate share being based on dollar volume of business.

It appears that when the contract was entered into defendant stock-

holders were: Melvin Roth, owner of a 2/3 interest; Roland Nordlund, owner of a 1/6 interest; and Rev. Melvin Hammerberg, owner of a 1/6 interest. Prior, however, to defendant's attempt at rescission, Roth and his wife became the sole stockholders of defendant corporation.

The parties operated under this agreement from April 1950 until January 31, 1956, at which time defendant notified plaintiff it was rescinding the agreement on the grounds that the plaintiff had refused to pay for all of defendant's advertising, including circular advertising except that which defendant claimed was promotional. During this period defendant spent from $43,000 to $45,000 for circular advertising. No demand had been made by defendant for payment of this amount until plaintiff's suit was instituted following January 31, 1956. No accounts receivable were kept by defendant showing that this amount was due from plaintiff either on income tax returns or otherwise. Defendant then for the first time took the position that the plaintiff was obligated to pay for this circular advertising from the inception of the agreement although defendant must have known throughout this period of time that he could have rescinded if he was correct in taking that position.

Roland Nordlund, who was secretary of the defendant corporation and an original signer of the agreement and who continued active in the management in the corporation until he sold out his interest in 1955, testified as follows at the trial:

"Q. And at that time when you started running those circulars you understood did you not that they would be paid for exclusively by the Hillcrest Super Food Markets, Incorporated?

"A. That was my understanding.

"Q. At no time did Mr. Roth ever tell you in his capacity as president of that corporation or any capacity Cut Price was to pay for those circulars he was running?

"A. No, I knew of no agreement they were to pay for our circulars.

\* \* \* \* \*

"Q. At the end of the year when the cost of advertising was com-

puted for the Hillcrest Super Food Market, Incorporated, the amount spent for circulars was included in your overall advertising picture, was it not?

"A. Yes, we paid the bills if that is what you mean, yes.

"Q. It was carried in your income tax for the circulars was it not as an advertising expense?

"A. Right.

"Q. It was never carried by the corporation as far as you know as an account receivable in any form than expense of this circular advertising?

"A. No."

The record indicates that the Roths and the Nordlunds had kept up friendly relations. Nordlund was an independent witness. The record discloses that he was actively engaged in the operation of defendant's business until he sold his interest in 1955 and that he had devoted full time to the business for approximately 5 years.

Roth himself, nevertheless, maintained when testifying that plaintiff was to pay for defendant's circular advertising, stating that it was not his custom to pay out such large sums of money (the cost of his circular advertising) when he had it coming from others. When interrogated on that issue, he testified as follows:

"Q. Is it your custom to spend Forty-three Thousand Dollars worth of your money in an effort to get along if you think you have it coming from something else?

"A. No."

Defendant continued to make its franchise payments pursuant to the terms of the agreement until it notified plaintiff that it was rescinding the agreement. No cost of circular advertising was ever deducted from the franchise fee payments. There is evidence that there were other forms of advertising, such as television shows, and for these defendant contributed its proportionate share. The record, however, shows that throughout this entire period plaintiff had paid for all newspaper ads, which ads had cost approximately $200,893.43 and all of which had carried defendant's name designated in the same manner as other stores owned or licensed by the plaintiff. It is also shown by the rec-

ord that in the first month of defendant's operation under the agreement it had paid out sums of money on its own for advertising for which it had not demanded reimbursement from the plaintiff until it counterclaimed in plaintiff's action.

Mr. Roth, when testifying in behalf of defendant, said that plaintiff had placed no restriction on defendant as to how much it could advertise, but complained that defendant was never given any authority by plaintiff to spend any sums of money for circular advertising and that therefore the expenditure for circular advertising was made at defendant's own discretion. The testimony of Mr. Roth indicates that he was of the opinion that if in its own discretion defendant spent more money for circular advertising than was due Cut Price for the franchise fee defendant would owe Cut Price nothing for the franchise fee. He also testified that if defendant was receiving circulars for its own store, it would not have too much effect on defendant's store if a store in Highland Park owned by plaintiff did not carry defendant's address on its circular ads, and furthermore that after 1950 to 1951 no difficulty that defendant encountered could be pinpointed to the fact that what has been referred to as the Cut Price Highland Park store did not carry defendant's address on Highland Park store circulars. This admission was made by Mr. Roth, even though he claimed that the plaintiff in its circular ads in connection with certain stores failed to carry defendant's name and address on such circulars. No similar complaint appears in the record with regard to plaintiff's newspaper advertising.

While defendant has argued at length to maintain its claim that plaintiff breached the agreement because it did not include defendant's address on its handbills circularized for the distant Highland Park store, the record discloses that, except during the time when plaintiff opened their new store on what is referred to as East County Line, it placed only the address of the store being circularized on the handbill. Mr. Roth admitted testifying that it would not have too much bearing on him if defendant's address was not carried on the Highland Park store circular if he was getting circulars of his own, and at the same time further stated that it would not make any difference to him if his address was not on the Prior store circulars of a Mr. Goodman, as "he is way across town." The record shows that the Highland Park store is

further from defendant's place of business than what is described as the Prior store of Mr. Goodman. Nevertheless, defendant argues that one of its reasons for attempting to rescind was the fact that the plaintiff did not carry defendant's address on the Highland Park store circulars which he said caused him confusion and embarrassment, but this he also said did not exist after 1950 to 1951. Roth also stated in his testimony that it would not have caused him confusion or embarrassment if he had circulars of his own, but the evidence shows that throughout this period of time prior to the attempted rescission defendant had its own circulars and issued them almost every week. It appears that the testimony of Mr. Roth, rendered ineffective by his own admissions, gave rise to the question before the court below—if plaintiff was not obligated under the contract to pay for defendant's circulars, how could it suffer sufficient damages to support a rescission of the contract from the single fact that defendant's address was not included on plaintiff's Highland Park store circulars?

Defendant complains that plaintiff did not make advertised items which were scarce available to it. Mr. Roth's testimony in behalf of defendant on that issue was couched in general terms. He did not get down to specific cases. Mr. Albert Newman, the meat manager for defendant, could recall only one instance regarding turkeys, but he also testified that the amount of turkeys to be purchased was also discretionary with Mr. Roth; Mr. Roth could only specifically recall the turkey situation and one other referred to as the Ajax Cleanser situation. However, the items which Roth considered scarce would have to be available to Cut Price. Donald Sheehan, the Colgate-Palmolive soap salesman, testified that he made three calls on Roth to ask him to take the particular Ajax Cleanser deal referred to in the record and Roth did not want it. At the time in question defendant could have bought all the Ajax Cleanser he wanted. It was scarce and unavailable only on the one particular day. There was no claim Ajax Cleanser was available to plaintiff only at the reduced price. Roth was asked:

"Q. There is no claim is there that Ajax Cleanser at this reduced price was only available to Cut Price?

"A. Not in any way, shape, or form, it was available to all merchants."

One of Mr. Roth's contentions appeared to be that those items were advertised and he was not advised. Defendant's own witness, one Rivets, said that if defendant did not get the circular of the advertised items on Saturday morning, a telephone call was made, and each and every item was read to him. Nevertheless the turkey situation and the Ajax Cleanser situation appeared to be items instrumental in defendant's attempted rescission of the contract.

There is evidence that at the time the defendant purchased the real estate for its supermarket just prior to the making of the agreement there were very few residences in the area of defendant's location. According to the record there were two meager filling stations, eight or ten residences to the east, though there was considerable building to the west.

The record discloses that because of the opening of a Klein and Applebaum supermarket sometime in 1953 in the immediate area of defendant's store, defendant's gross volume dropped. The plaintiff, in order to aid and assist defendant in getting the gross back up, began furnishing to defendant circulars in amounts varying from 5,000 to 10,000 but at Mr. Roth's request discontinued this assistance and began to give Roth a credit of $100 per week toward his purchases so that he might use this money to advertise as he saw fit.

There is nothing in the record to indicate that the defendant had defaulted in paying his franchise checks. The January 1956 franchise check, however, was sent to plaintiff on February 22, 1956, with a notation it was in full for all liabilities under the contract. It was handled by Mr. Cohen as the franchise checks had formerly been handled, was accepted and deposited as the January payment only. Nothing appears to indicate that there was any dispute as to whether it was the amount due and owing to plaintiff for the January payment. The record indicates that the amount of the check was arrived at on the part of the defendant by figuring the percentage of the gross and deducting certain credits for merchandise defendant had coming from the plaintiff. Defendant in answering plaintiff's complaint denied any breach of the agreement and alleged rescission due to breaches thereof by the plaintiff. It admits in its answer that it has not offered for sale to plaintiff the real estate, building, fixtures, and stocks upon the terms set forth

in paragraph 15 of the agreement, stating as the reason therefor the fact that it has rescinded the agreement owing to plaintiff's material breach of the same and the acceptance by plaintiff of a final accord and satisfaction of the agreement. Defendant further answering enumerates certain affirmative defenses constituting the breach and counterclaims for damages against the plaintiff in the amount of $55,000 based upon the items enumerated as constituting the material breaches of the agreement on the part of plaintiff.

At the close of all the evidence at the trial below, defendant first moved that the plaintiff be obliged to elect between what it termed two inconsistent causes of action; namely, the one for damages, and the one for specific performance. Defendant argued that plaintiff in its prayer for relief asked for damages and for specific performance in the alternative. To this the trial court countered: "The Court proposes to reserve to itself all questions of an equitable nature." Defendant then moved to dismiss the claim for damages, separating the motions on several different grounds, all of which motions were denied. Plaintiff then moved for a directed verdict in answer to which the court stated:

"While you are making a motion for a directed verdict, the way I propose to handle it that on the 31st of January, 1956 the plaintiff had fully performed its part of the contract; that the defendant had breached it; that the breach still continued and that the only question for the jury is that of damages."

Plaintiff then moved to strike from the record all reference to cooperative advertising, both newspaper and circular, on the ground that it had been objected to throughout the trial and that it was not material to the issues in this case; that there was no oral modification except as of May 1955 when it was said defendant could make any deal it wanted and which was not material so far as affecting the outcome of the trial. The court granted the motion, stating that according to the defendant's own testimony it never claimed that. The plaintiff then moved to dismiss the counterclaim of the defendant upon the grounds that there had been no showing of any breach of the agreement on the part of the plaintiff or damages resulting to the defendant in any regard. This motion was likewise granted by the court.

It is clear that the trial court at the close of the testimony took the view that the interpretation of the written agreement between the parties, upon the record before it, became the function of the court and not the jury, and the court charged the jury in part as follows:

"* * * The language of Exhibit A [the agreement] is unambiguous and no subsequent oral modification of the terms material to the controversy before us has been proved by clear and convincing evidence, so the Court instructs you that Exhibit A, as I have summarized it for you, is the contract between the parties; that on February 1, 1956 the plaintiff had performed its part, that on that date the defendant breached it, and that that breach still continues. Therefore, the only issue to be submitted to you is that of the damages to be awarded to the plaintiff. The Court reserves for its own decision all other issues in this controversy."

The jury returned a verdict in favor of plaintiff and assessed its damages in the sum of $58,618.12. The defendant has raised no issue as to the verdict being excessive if plaintiff is shown to be entitled to recover.

Defendant alleges the following breaches of the agreement on the part of plaintiff and bases its right to rescind thereon: (1) Failure and refusal by plaintiff to pay for defendant's circular advertising; (2) failure by plaintiff to include defendant's address on plaintiff's Highland Park store circulars; (3) failure by plaintiff to make available to defendant advertised items which were scarce and available to plaintiff.

Defendant assigns the following errors: (1) The trial court erred in directing a verdict for plaintiff, submitting only the question of damages to the jury; (2) the trial court erred in refusing the instructions requested by defendant on the question of breach of contract; (3) the trial court erred in refusing to submit the question of accord and satisfaction to the jury; (4) the trial court erred in refusing to order a new trial on the ground of newly discovered evidence.

The parties appear to be in agreement that the following questions of law are involved: (1) Did the contract between the parties require plaintiff to include defendant's address in its circular advertising? (2)

Did the evidence of breach of the buying service obligation of plaintiff require its submission to the jury? (3) Did the evidence of accord and satisfaction require its submission to the jury? (4) Was the newly discovered evidence such as to require the trial court to grant a new trial? (5) Was the attempted rescission by defendant null and void and ineffective as a matter of law?

The position of defendant on this appeal is that the trial court construed the contract to mean what the trial court thought the parties ought to have intended by their agreement rather than what the plain language of the contract states, and so construing it, wrongfully proceeded to take from the jury the question whether there had been breaches by plaintiff which justified defendant in rescinding the agreement.

The dispute between plaintiff and defendant centers largely upon the ruling of the court that the interpretation of the contract was the function of the court and not of the jury.

The defendant argues that paragraph 5 of the agreement says that defendant's address is to be included in all of plaintiff's advertising of supermarkets owned or licensed by them; that this was not limited to newspaper advertising but that it included all circulars as well. Plaintiff's contention is that the only construction that can be placed on the contract and the evidence and the record is that defendant was to pay for its circular advertising and that the evidence on the whole is conclusive that the contract was not breached because defendant's address was not carried on the circular advertising of the plaintiff. Based upon the aforesaid contentions of the defendant, it submitted certain requested instructions on those issues which were refused by the trial court.

■ The rule appears to be well established that only a material breach of a contract or a substantial failure in its performance justifies a party thereto in rescinding. Heyn v. Braun, 239 Minn. 496, 59 N. W. (2d) 326; 4 Dunnell, Dig. (3 ed.) § 1808.

The record indicates that the defendant felt that the agreement, if it was breached, was breached in 1950 in connection with plaintiff's advertising in connection with its Highland Park store; that in spite of defendant's apparent knowledge thereof it continued for a full 5

years to make its franchise payments regularly and to live up to the required payments it had to make for merchandise and during this period paid for its own circulars and received in addition thereto those that were supplied free by Cut Price. Under these circumstances there is nothing to indicate that the defendant at any time gave prompt notice of its intention to rescind upon the discovery of any claimed breach. It is clear that the defendant had the benefit and use of the name of Cut Price for the 5 full years plus all the advertising plaintiff had done and services it had given to defendant gratuitously without any notice of rescission. The defendant elected to exercise whatever right of rescission it may have had, if it had any, after plaintiff commenced the within action. In doing so it took no action to place the plaintiff in status quo. With knowledge of the breach which it claimed had occurred in 1950 or 1951, it slept on its rights until 1956 and failed to comply with what the law requires; namely, prompt notice of intent to rescind upon the discovery of any claimed breach.

It is our view that the only construction that can be placed on the contract and the evidence is that the defendant was to pay for its circular advertising and that in that regard the evidence must be considered conclusive that the contract was not breached because of defendant's address not being carried on the circular advertising of plaintiff. We think the court was justified on the evidence in ruling that in the instant case the interpretation of the written agreement was for the court and not for the jury. Under the circumstances there was no prejudicial error on the part of the court in refusing defendant's requested instructions.

One wishing to rescind the contract for breach thereof must act promptly. After one party to a contract has performed a substantial part of it, the other party cannot rescind for default in further performance unless the defaulting party can be placed in status quo, but is limited to an action for damages for the breach. It is not every breach of contract which justifies rescission. The right to rescind must therefore be exercised promptly on discovery of the facts from which it arises and it is clear under the law that it may be waived by continuing to treat the contract as a subsisting obligation. See, 4 Dunnell, Dig. (3 ed.) § 1808, and cases cited; 12 Am. Jur., Contracts, § 447, and cases

cited. In 12 Am. Jur., Contracts, § 451, we find the following general statement:

"The very idea of rescinding a contract implies that what has been parted with shall be restored on both sides. Releasing one party from his part of the agreement and excusing him from making the other party whole do not seem agreeable to reason or justice. Hence, the general rule is that a party who wishes to rescind an agreement must place the opposite party in statu quo. An attempted restoration of the status quo is an essential part of rescission of a contract. As part of the rule requiring the placing of the other party in statu quo, it is held that a party cannot rescind and at the same time retain a benefit under the contract."[1]

The defendant has cited White v. Erickson, 141 Minn. 141, 169 N. W. 535, and Bradford v. Doherty, 186 Minn. 18, 242 N. W. 339, as controlling cases in support of its contention that the construction of the agreement herein should have been submitted to the jury. Defendant does not contend, however, that the language in the contract is ambiguous.

In the Bradford case this court found that the jury might, if the question were submitted to it, find that there was a mistake on the part of the plaintiff and that the defendant in that case had not really claimed that the contract was at an end or that there was a repudiation and that such repudiation was understood by plaintiff. The defendant does not claim any mistake here. Certainly it clearly repudiated the agreement on its part and necessarily its defense must stand or fall on the construction of the agreement here involved. In the White case the important question involved was whether the contract was ever renounced. There is no such question here. This court has recognized

---

[1] 12 Am. Jur., Contracts, § 449; Smith v. Smith, 235 Minn. 412, 51 N. W. (2d) 276, 32 A. L. R. (2d) 1135, wherein this court defined waiver as a voluntary relinquishment of a known right; Dobie v. Sears, Roebuck & Co. 164 Va. 464, 180 S. E. 289, 107 A. L. R. 1026; Josten Mfg. Co. v. Medical Arts Bldg. Co. (8 Cir.) 73 F. (2d) 259; 3 Williston, Contracts, § 700.

the rule to be well established that ordinarily the construction of a writing which is unambiguous is for the court, and particularly so when the intention of the parties is to be gained wholly from the writing. If the writing is ambiguous, resort may be had to extrinsic evidence; and the construction then becomes a question of fact, unless such evidence is conclusive. But ordinarily, the question whether the language of a contract is ambiguous is one of law for the court, and the extrinsic facts which may be considered in aid of construction are ordinarily questions for the court. Therefore, where parties to a contract have given it a practical construction by their conduct, as by acts in performance thereof, such construction may be considered by the court in determining its meaning and in ascertaining the mutual intent of the parties, and where such extrinsic evidence is conclusive and undisputed and renders the meaning of the contract clear, the situation presents a question of law for the court. See, Leslie v. Minneapolis Teachers R. F. Assn. 218 Minn. 369, 16 N. W. (2d) 313, and cases cited therein.

We are in agreement with the court below as to who was to pay for the circular advertising based upon the terms of the written agreement and the conduct of the parties as disclosed by the record. Both the testimony of Roland Nordlund, who was secretary of the defendant corporation for the first 5 years under the agreement, and the admissions of Melvin Roth, its president, provide added reason for reaching that conclusion. The law will impute to a person an intention corresponding to the reasonable meaning of his words and also his actions. Words are not the only medium of expression. The conduct of the parties is also to be looked to since it often conveys as clearly as words a promise or an assent to a proposed promise. Restatement, Contracts, § 20, *comment a,* contains the following statement: "Not mutual assent but a manifestation indicating such assent is what the law requires." Therefore, the interpretation given by the parties themselves to the contract as shown by their own acts may be adopted by the court, in fact will be adopted by it, and in this respect not only the acts but the declarations of the parties may properly be considered. 3 Williston, Contracts, § 623, states that "if the meaning of the contract is plain, the acts of the parties cannot prove an interpretation con-

trary to the plain meaning." Such conduct, however, may be evidence of a subsequent modification of their contract.[2]

Little need be said regarding the claim of defendant that plaintiff had failed to make available to defendant advertised items which were scarce and available to plaintiff. Two situations were referred to by Mr. Roth testifying in behalf of defendant; one a single situation involving turkeys and the other the item of Ajax Cleanser. The testimony explains these situations away to the extent that neither carries with it any materiality; other specific instances in connection with that complaint are not forthcoming in the record.

We come to the question of the January 1956 franchise check sent to plaintiff by defendant on February 22, 1956, with a notation that it was in full of all liabilities under the agreement. The record is barren of any forewarning that this check was being sent in the settlement of a dispute. The following testimony by Mr. Roth we think quite decisive in ruling out accord and satisfaction in this case:

"Q. That check is dated February 22nd, I don't believe there is a year on there, I wasn't able to find one, but it was 1956, was it not?

"A. February 22nd, Cut Price Supermarket $1,099.42.

"Q. And that covered your January payment for the franchise?

"A. That is right.

"Q. Now can you tell us how you arrived at that particular figure?

"A. Undoubtedly that was the amount of money that was due them for the franchise payment for January which represented one per cent of sales less possibly a few credits that we had between stores from time to time relative to deliveries that were made by myself and deliveries made that is they had picked up from our stores which occurred many, many times.

\* \* \* \* \*

"Q. In any event the amount of $1,099.42 was arrived at by com-

[2]Also see, Dybvig v. Minneapolis Sanatorium, 128 Minn. 292, 150 N. W. 905; Thompson v. Davidson, 136 Minn. 368, 162 N. W. 458; Benedict v. Pfunder, 183 Minn. 396, 237 N. W. 2; Wallace v. Joseph Dixon Crucible Co. 223 Minn. 162, 25 N. W. (2d) 465; Johnson v. Quaal, 250 Minn. 154, 83 N. W. (2d) 796.

puting the franchise fee and deducting therefrom certain credits you had coming?

"A.   That is right.

\*   \*   \*   \*   \*

"Q.   So when you sent the check to Cut Price there was no dispute between you and Cut Price as to the amount of the franchise fee that would be due them after deducting the credit they were entitled to?

"A.   There was no argument on that, it was based on one per cent of sales for January.

"Q.   It was as far as your mathematical computation based on what you reported as your gross monthly sales?

"A.   That is right."

Similarly Mr. Cohen, on behalf of plaintiff, testified that this was the amount due and was accepted only as the January franchise payment:

"Q.   And although you knew it was on there you still said put the check through for collection?

"A.   I accepted that check for the January franchise the same way I had done fifty times previous to that."

The record fails to disclose that this check was accepted by the plaintiff as an accord and satisfaction. The rule has always been clear that the mere retention by the creditor of money to which he is entitled absolutely will not amount to an accord and satisfaction although tendered or transmitted to him as payment in full of demand. In an accord and satisfaction, it is the mutual agreement of the parties to the terms of the compromise and not the dispute which furnishes the consideration for the release. In this case the defendant paid what he admitted to be due and no more. This did not even present a compromise nor can it be an accord and satisfaction. It is true that Mr. Cohen did not return the January franchise payment check with the notations upon it but cashed it as he had theretofore done with all prior franchise payment checks. Since it is conceded by all parties to have been due and owing to the plaintiff at the time in question as a monthly franchise payment, the plaintiff may rest secure in the principle that the law does not require one to do a useless thing. The evidence is clear in the instant case that there was absolutely no known or open dispute be-

tween the parties whatosever as to the amount due the plaintiff for the January 1956 franchise payment. Likewise, it is clear that no mutual agreement came into being between the parties to provide the terms of a compromise. The rule as to the acceptance of a check which is presumably sent as payment in full of a claim is set forth in 1 Dunnell, Dig. (3 ed.) § 42, where it is stated that the claim must be disputed. There were no negotiations preceding or leading up to the issuing of the January 1956 check in the instant case. We have here nothing more than the payment of a debt admitted to be absolutely and wholly due.

Plaintiff points out that although it might be urged that Rye v. Phillips, 203 Minn. 567, 282 N. W. 459, 119 A. L. R. 1120, has abrogated or changed the principles of law on accord and satisfaction set forth in the leading cases of Duluth Chamber of Commerce v. Knowlton, 42 Minn. 229, 44 N. W. 2, and Marion v. Heimbach, 62 Minn. 214, 64 N. W. 386, a close reading of the Rye case indicates that that case is no more than authority for the principle that an agreement by a creditor to accept less than the amount due on a liquidated, past-due indebtedness in discharge of the whole is binding on the creditor although not supported by any consideration.[3]

■ Defendant urged the court below to grant a new trial on the grounds of certain evidence which it claims was newly discovered. There are indications in the record that the defendant knew or should have known of the existence of the circular advertisements of which it complains prior to or during the trial. The record is not conducive to the support of the claim that the defendant was unaware of what has been referred to as the advertisements of "The Highlander" prior to or during 1951. Those advertisements carried defendant's address. They were also carried in "The Rose Tribune" in 1950 and some circulars

---

[3]Also see, Isaacs v. Wishnick, 136 Minn. 317, 162 N. W. 297; Demeules v. Jewel Tea Co. 103 Minn. 150, 114 N. W. 733, 14 L.R.A. (N.S.) 954; C. W. La Moure Co. v. Cuyuna-Mille Lacs Iron Co. 147 Minn. 433, 180 N. W. 540; Wright v. Lynch, 102 Minn. 96, 112 N. W. 892; Foster County State Bank v. Lammers, 117 Minn. 94, 134 N. W. 501; Shema v. Thorpe Bros. 240 Minn. 459, 62 N. W. (2d) 86; Davis v. Newcombe Oil Co. 203 Minn. 295, 281 N. W. 272; Note, 9 Minn. L. Rev. 458.

in 1951. Mr. Roth admits in his affidavit attached to the moving papers that the February 1950 issue of "The Highlander" was introduced in evidence the last day of the trial. The record gives little if any support to the claim that the defendant used reasonable diligence in seasonably discovering the so-called newly discovered evidence. If such had been present and introduced, it would have had little if any effect upon the outcome of the trial. There must be a clear showing that the result would be materially affected by such newly discovered evidence. Such a showing is lacking. We see nothing in the so-called newly discovered evidence which would have required the court to reach a different conclusion. The record indicates that the defendant had knowledge of its existence during the trial. Defendant's evidence was based upon rescission. If it were in the record it would only prove a breach, if in fact it could furnish such proof, occurring some 5 years before the rescission here involved. It is somewhat late to urge rescission on any such grounds 5 years later and where defendant was not entirely ignorant of the grounds. Newly discovered evidence which merely seeks to impeach the evidence offered at the trial will not be sufficient grounds for a new trial, and this in part appears to have been its obvious purpose.[4]

■ The rules applicable to granting new trials for newly discovered evidence are set forth in 14 Dunnell, Dig. (3 ed.) §§ 7123 to 7131b, supported by numerous citations. The matter of granting a new trial on those grounds rests very largely in the discretion of the trial court—a discretion to be exercised cautiously and sparingly and only in furtherance of substantial justice. An appellate court is especially reluctant to grant a new trial when it has been denied by the trial court on conflicting affidavits; it must be made to appear that it was an abuse of discretion on the part of the trial court in denying the motion. Clearly if the newly discovered evidence is cumulative of similar testimony received at the trial, it is within the discretion of the trial court to de-

---

[4]Also see, Krahn v. J. L. Owens Co. 138 Minn. 374, 165 N. W. 129; Vietor v. Costello, 203 Minn. 41, 279 N. W. 743; State v. Bergeson, 203 Minn. 88, 279 N. W. 837; Skog v. Pomush, 219 Minn. 322, 17 N. W. (2d) 641.

termine whether ends of justice require a new trial on strength of such newly discovered evidence. Manahan v. Jacobson, 226 Minn. 505, 33 N. W. (2d) 606.[5]

An examination of the trial court's charge indicates that the jury was fully and correctly advised on the matter of assessing damages. No claim that the damages were excessive has been argued by the defendant. Apparently the defendant reached for rescission as one of its defenses and has concluded that if it cannot sustain that defense it will under the verdict have paid no more than it would be obligated to pay under the contract if fully performed.

We reach the conclusion that defendant has failed to satisfactorily sustain its attempted rescission, its defense of an accord and satisfaction, and likewise the right to a new trial on the grounds of newly discovered evidence. The order of the trial court must therefore be affirmed.

Affirmed.

[5]Also see, Bradley v. Norris, 67 Minn. 48, 69 N. W. 624; LeVeaux v. Holt Motor Co. 181 Minn. 355, 232 N. W. 622; Albertson v. Albertson, 243 Minn. 212, 67 N. W. (2d) 463; Merek v. S. J. Groves & Sons Co. 200 Minn. 418, 274 N. W. 402.