**OSKEY GASOLINE AND OIL COMPANY INC., a Minnesota corporation, Plaintiff,**

v.

**OKC REFINING INC., a Delaware corporation, Defendant.**

**No. 4–73 Civ. 180.**

United States District Court,
D. Minnesota,
Fourth Division.

Sept. 18, 1973.

---

Dorsey, Marquart, Windhorst, West & Halladay, by Peter Dorsey, Minneapolis, Minn., for plaintiff.

Faegre & Benson, by Lawrence C. Brown, Minneapolis, Minn., for defendant.

NEVILLE, District Judge.

This case presents an interesting and novel question as to the meaning and application of Section 2–207 of the Uniform Commercial Code, Minn.Stat. § 336.2–207. It arises because one of the parties to a proposed agreement inserted before signing, over the other party's signature who had tendered it, additional language which was designed to conform the agreement to the parties past practices. The agreement when so altered and signed was returned to the original signator who for some period of time performed thereunder. The issue now raised upon cessation of such performance prior to the termination date is whether the parties have a valid contract.

For the most part the facts are not in dispute. Plaintiff is a wholesale distributor of oil products, including gasoline and fuel oil, operating in a twelve-state Mid-west area from Oklahoma to the Canadian border. It sells principally to so-called independents which in turn, at gas stations and through storage facilities, sell to the public.

Defendant is a refinery in or near Okmulgee, Oklahoma processing crude oil into a number of products but principally gasoline of different grades and heating oil. It has a capacity of 20,000 barrels a day and until January 1, 1973 purchased its crude oil through Phillips Oil Company. In early 1972 plaintiff and defendant commenced doing business, to some extent on a trial basis, whereby plaintiff purchased 300,000 barrels of gasoline from defendant refinery. A barrel normally contains 42 gallons. Ultimately and on or about October 1, 1972 the parties concluded to formalize their arrangement and to enter into a written contract for a somewhat extended period. At this time plaintiff was in debt to defendant for over three hundred thousand dollars. Plaintiff informed defendant that the only way payment could be possible was if defendant agreed to continue to sell plaintiff product so that plaintiff could earn the money to pay the debt. Accordingly, defendant offered to sell plaintiff product for fifteen months if plaintiff paid off its debt, partially by immediate payments, and partially by the signing of a short term note. Plaintiff kept its bargain and as of date of trial all amounts due on this debt had been paid in full.

After fairly lengthy negotiations, two written sale and purchase agreements were perfected. The first, plaintiff's Exhibit 1, provided for the sale and purchase of 15,000 barrels per month of 70% regular and 30% premium gasoline, deliveries to be made on buyer's order into buyer's trailer from an independent pipe line having a number of stations throughout the Mid-west area. The agreement by its terms expires December 31, 1973, provided for taking delivery by plaintiff from Williams Brothers Pipeline System, provided a schedule of prices, and contained a force majeure performance clause excusing defendants performance from a number of broadly worded causes.

The second contract (plaintiff's exhibit 2) is similar except that it relates to 5,000 barrels per month of Distillate (fuel oil) with a different price and pro-

vides for its termination March 1, 1973. The second contract thus by its terms had expired by the time of the commencement of this lawsuit and is no longer of import in this case.

The contract here involved was prepared by defendant's legal staff, signed by defendant's vice president and forwarded with a covering letter (Plaintiff's Exhibit No. 3) to plaintiff together with the promissory note for part of the indebtedness. Plaintiff added to the agreement on the typewriter language to paragraph 3 as shown hereinbelow in the italics so as to make paragraph 3 read as follows:

"3. DELIVERY AND MEASUREMENT

The quantity of motor fuel gasoline loaded into trucks shall be determined by truck loading rack meters, *as computed in gross gallons.*"

Plaintiff also inserted the date in paragraph 2 "commencing October 1, 1972" and its president initialed these changes in the margin and returned the signed copies to defendant. Plaintiff by letter, in returning the altered agreement indicated to defendant that it wanted a revised agreement with the added words included. The court places little emphasis on the fact that plaintiff's president called the added words "changes" at that time. He is not a lawyer and it is clear that any added word is a "change" in the general sense in the contract as it was sent.

Defendant shortly commenced shipments or delivery though in no month from October 1972 to March 1973 did it deliver the agreed upon 15,000 barrels per month. In the more than five months' pre-contract period from February 23, 1972 to August 8, 1972 the volume of gas purchased by plaintiff was 13,334,030 gallons for a total cost of $1,354,428.62. As of March 1, 1973 defendant discontinued deliveries to plaintiff entirely and except for a small amount stipulated to following the institution of this action,[1] plaintiff has received no supplies of gasoline or oil from defendant. Defendant's evidence establishes that as of January 1, 1973 through no fault of its own Philips Petroleum terminated its supply contract for crude oil; that defendant has been making efforts elsewhere to procure crude oil but has been able to procure only enough to produce an average from October 1972 through July 1973 of approximately 75% of its daily capacity. It pleads impossibility in obtaining adequate supplies of crude oil.

It was developed at the trial that there is a difference between gross gallons and net gallons. It is conceded that gas expands with heat; that delivery at the so-called rack on the Williams Bros. Pipeline at 60°F. is considered the norm; that if the temperature is in excess thereof the number of gallons received is reduced in proportion as the temperature increases above 60°, and increased in proportion as the temperature decreases below 60°. So that if delivery is taken at 20°F., for instance more gallonage occupies the same space in a truck or trailer than at 60°F.; and vice versa less gallonage if delivered at 90°F. Commencing October 1, 1972 defendant billed plaintiff on a net gallonage basis and plaintiff remitted on a gross gallonage basis. To March 1973 the difference was pleaded to amount to $5,415.59, though at the trial it developed that the actual difference was approximately $4,500, the balance being a disallowance of a discount claimed for payment within a certain period. On March 9, 1973 defendant claims to have transmitted a letter to plaintiff's president demanding it "fulfill its obligations under the agreement date October 18, 1972", claiming a breach of agreement citing the fact of $5,415.59 as due and "accordingly we hereby notify you that OKC will not sell any additional gasoline or other additional products to [plaintiff] and

---

1. No point has been made of this in the current lawsuit.

cancels any agreement of whatsoever nature and kind it has with [plaintiff]." Plaintiff denies ever having received this letter but plaintiff's president did have telephone conversation with defendant's personnel and shortly remitted the $5,415.59 which check was cashed by defendant and it cleared plaintiff's bank. Plaintiff claims it made it clear that this payment was made "under protest."

Plaintiff takes the position that under Section 2.207 of the Uniform Commercial Code the additional language inserted by plaintiff's president at the time of signing the agreement did not affect the parties contractual relationship and such additional terms became a part of the contract because the offer (tendered by defendant in a signed contract) was not expressly limited to its terms and in any event the additions did not materially alter the contract and no later notification of objection was given by defendant. Plaintiff also relies on the fact under 2.-207(3) that the conduct of both parties, namely the shipment of product, evidenced that the parties did have a contract and that defendant so understood.

Defendant originally took the view in its answer that the addition of the words "computed in gross gallons" constituted the document a counteroffer, was not authorized to be inserted over the signature of the defendant, and never having been accepted nor the originals ever returned to plaintiff that no contract exists. At the trial plaintiff took the position that there is and was a contract, the only question being its terms and whether plaintiff breached the same so as to justify a termination by defendant. Prior to the addition of the extra words the meaning of the sentence might seem clear enough to someone ignorant of the oil industry. However, as the testimony indicated, truck

loading rack meters on pipe lines measure fuel in both gross and net quantities. And the difference in the standards, as described above, will result in a difference in price and quantity. Thus, prior to plaintiff's addition the agreement contained a latent ambiguity. To someone knowledgeable about the petroleum industry a glance at the above sentence would provoke a question as to *which* truck loading rack meter was meant to control.

■■ Having concluded that there is an ambiguity in the writing as proferred by defendant this court must look to other evidence to decide what the parties meant. This evidence will aid the court in arriving at the objective intent of the parties, Cut Price Super Markets v. Kingpin Foods, Inc., 256 Minn. 339, 98 N.W.2d 257 (1959). Of course it is the intent of the parties which the court is to discover and enforce. Independent School District No. 877 v. Loberg Plumbing & Heating Co., 266 Minn. 426, 434, 123 N.W.2d 793 (1963).

■ Objective evidence of intent may be found in prior dealings between the parties. Minn.Stat. § 336.1–205.[2] defines "course of dealing":

(1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

Plaintiff and defendant had dealt with each other on a gross gallons basis for some five or six months prior to October 1972. This was the only quantity standard they had ever used in their dealings. Plaintiff claimed it never received product from any supplier any other way. It seems clear that any "common basis of

2. The Uniform Commercial Code (UCC) is applicable to this transaction. UCC § 2.-105(1) defines the "goods" to which the UCC applies as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." Certainly the motor fuel gasoline and fuel oil covered by the contract in issue fall properly under this definition. The UCC controls this case.

understanding" must have been on a gross gallonage basis. It is obvious that this was the way plaintiff wanted to receive its product, and defendant was certainly aware of this desire.

Minn.Stat. § 336.1–205(3) defines the effect which a course of dealing between the parties is to be given in interpreting their conduct and expressions:

> A course of dealing between the parties . . . give(s) particular meaning to and supplement(s) or qualif(ies) terms of an agreement.

Defendant wrote the October agreement and did not make any specific reference to the fact that it wanted a change in the manner in which the parties had been dealing. Under this circumstance, and because defendant appears to be the party who later wanted to change the nature of the relationship rather than simply extend its duration, it seems to this court that the onus was on defendant to have inserted the term "net gallons" in its proposal or to have objected immediately to the words plaintiff inserted. Otherwise, with the contract not specifying which measurement standard was to be used, the most reasonable expectation is that it would be the method which both parties had previously used. If the gross gallon relationship with plaintiff was as atypical as defendant indicated it was, one would think defendant would be specific if it proposed to change that relationship. Under 1–205(1), (3) this court is of the opinion that the previous relationship of plaintiff and defendant on a gross gallons basis "supplements" and "gives particular meaning" to the written contract.

■ The conduct of the parties when performing may also be relevant in defining contract terms. National Heater Co., Inc. v. Corrigan Co. Mech. Contractors, Inc., 482 F.2d 87 (8th Cir. 1973). Another section of the UCC, Minn.Stat. § 336.2–208 states:

> (1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

This contract did call for repeated performances by both parties. Defendant was to deliver product frequently, if not daily, and plaintiff was to make repeated payments. Defendant was to bill plaintiff at least monthly. Both parties had knowledge of the other's performance and the opportunity to object to it. Thus it appears that the basis for application of 2–208 is present.

■ In this case plaintiff performed consistently with a gross gallons contract. First, it added to the proferred agreement words which indicated gross gallon measurement would control. Second, plaintiff sent a letter requesting the contract be redrafted and resigned with these changes. Third, plaintiff consistently paid for the product it received in gross payments although it was billed in net. In terms of 2–208 this "course of performance" by plaintiff and the continuation of deliveries by defendant without objection is both evidence of the way that parties construed the contract and a real objection to the way defendant now would like to construe the contract.

■ ■ Defendant did not object to plaintiff's course of performance. The only response defendant made to the fact that plaintiff wanted the agreement redrafted, or that plaintiff was paying in gross terms and not net as billed, was in March of 1973. This was five months after the contract commenced. It was after defendant had sold plaintiff over two million gallons of product and after a national shortage of petroleum began to develop and became somewhat alarming. Although 2–208 does not by its terms specifically require a timely objection this condition must be implied

to give 2–208 any consistency. Flood v. M. P. Clark, Inc., 319 F.Supp. 1043 (E. D.Pa.1970); *cf.* Construction Aggregates Corp. v. Hewitt-Robins, Inc., 404 F.2d 505 (7th Cir. 1969) (dealing with acquiescence over time under 2–207(3). In referring to "opportunity for objection" the section clearly must require a seasonable objection be lodged. Defendant, as it claims to have understood the contract, may well have thought that plaintiff was not paying properly. However this failure in performance was acquiesced in for five months. Defendant never refused to accept the payments proferred by plaintiff. Defendant cannot claim its having billed on a net basis was a proper objection when it was accepting payment on a gross basis *without protest* and cashing the checks. This court finds that a five month delay in the context of this agreement is simply not a properly timely objection to qualify under 2–208.[3]

There still remains the question of what effect should be given the words plaintiff added to the defendant's offer when he signed it.[4] The parties correctly point out that additional or different terms included in a purported acceptance are governed by U.C.C. § 2–207. That section provides in part:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) The offer expressly limits acceptance to the terms of the offer;

(b) They materially alter it; or

(c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

\*　　\*　　\*　　\*　　\*　.　\*

U.C.C. § 2–207(2)[5] indicates that additional terms become part of the contract unless (a) the offer limits acceptance to its terms, (b) the additions materially change the offer, or (c) the offeror notifies the offeree of objection to them. First, although a letter accompanied the submission of the sales and purchase agreement it by no means limited acceptance solely to the terms of the offer. It required the offeree acquiesce in all the terms contained in it, but did not preclude him from adding terms. More importantly since the measurement standard was not explicitly defined in the sale and purchase agreement it would be possible to agree to those terms and not necessarily agree to having a net standard used. Again, it must be emphasized that nowhere did defendant specifically require a net standard. Suffice it to say that defendant did not use language which clearly indicated it was attempting to avail itself of 2–207(2)(a) and limiting any acceptance to the terms of the offer. An example of a term which clearly indicated the offeror was attempting to avail itself of 2–207(2)(a) is found in In Re

---

3. Defendant alludes to the fact that plaintiff paid the amount defendant claimed was delinquent, due to plaintiff's paying on a gross not net basis, when it was demanded in March. The argument is that this is an indication that plaintiff knew it was a net contract. However, this payment was made under protest. Also, unless plaintiff paid, it realized it would get no more product from defendant. Under this type of impending harm it cannot be said plaintiff was indicating any belief in the terms of this contract.

4. Since the court has found a gross gallons contract was the intent of the parties an argument may be made that the words plaintiff added were not "additional terms" within the contemplation of 2–207. *See* American Parts Co., Inc. v. American Arbitration Ass'n, 8 Mich.App. 156, 154 N.W.2d 5 (1967).

5. The subparts of 2–207(2) only apply between merchants. The parties agree here that they are merchants. U.C.C. § 2–104.

Tunis Mfg. Co., 11 U.C.C.Rep. 544 (N.Y.Sup.Ct.App.Div. 1972), where the offers "contained a provision that no change in the [offers] could be effected-except by a writing signed by [the offeror]." 11 U.C.C.Rep. at 544.[6] It is axiomatic that written contracts must be construed against the maker when there is ambiguity. Freyberg v. London & Scottish Assurance Corp., 246 Minn. 417, 75 N.W.2d 203 (1956). Defendant's contract was prepared by counsel and was explicit in many instances. In the context of this case any attempt to limit acceptance to the terms of the offer could have been clearly stated. Thus 2–207(2)(a) should not preclude added words from becoming part of the contract.

If the additional language materially altered the terms of the offer, 2–207(2)(b) precludes the additional terms from becoming part of the contract. Thus the question arises whether the addition of the words "as computed in gross gallons" *materially* altered the defendant's proposal. Since the court is of the opinion that defendant's proposal is most reasonably read to call for a gross gallon measurement there is no alteration at all. *See,* American Parts Co., Inc. v. American Arbitration Ass'n, 8 Mich.App. 156, 154 N.W.2d 5 (1967). Even if the defendant's proposal were interpreted to call for a net gallon measurement however it is questionable whether a change to gross gallons would be a material change. There was conflicting evidence at trial concerning the actual price and volume difference. As mentioned above defendant did charge plaintiff, and plaintiff paid under protest some $4,500 (part of $5,415.59) for the price difference between two standards for the fuel actually delivered. Yet during this period defendant supplied plaintiff with over two million gallons of gasoline and over seven hundred thousand gallons of fuel oil. Plaintiff's overall charge was in excess of two hundred thousand dollars. The court is inclined to believe that on these facts the amount of but 2+% of overall volume would probably not be a material change; but it need not reach that issue.

Finally, 2–207(2)(c) prevents additional terms from becoming part of the agreement where the original offeror has notified the offeree of objection to them or notifies the latter within a reasonable time after they are received. As previously recounted there was no evidence at trial which indicated that defendant objected to the terms prior to March of 1973 when defendant billed plaintiff for the difference between gross and net gallons.

Since neither 2–207(2)(a), (b), or (c) preclude the additional words from becoming part of the agreement, they do become part of it. Accordingly, 2–207 does not alter this court's original conclusion.

Defendant has strenuously argued that the court should read 2–207(1) and (2) differently. It asserts that because 2–207(1) encompasses both "additional terms" and terms "different from those offered" and 2–207(2) refers only to "additional terms" that 2–207(2) should not apply in this case. Defendant's distinction between different and additional may or may not be sound, but the conclusion derived therefrom is not. It is reasonable to interpret "different" terms to mean terms that are contradictory to those stated in an offer. In other words, terms that conflict with the offer. UCC 2–207, Official Comment, Para. 6. Additional terms are terms that do not conflict with the offer, but simply add to it. Defendant argues that the notice of objection required in 2–207(2)(c) need not be made where "different" terms are included in a purported acceptance, and that objection may be inferred in such a case. This interpretation is bolstered by the facts that 2–

---

6. But see J. A. Maurer, Inc. v. Singer Co., 7 U.C.C.Rep. 110 (N.Y.Sup.Ct.1970), where even this language was not clear enough to void the offeror's duty to take affirmative action to avoid the impact of any condition contained in the acceptance.

207(2) does not refer to "different terms" but only "additional terms", and the Official Comment to Section 2–207, Paragraph 6 appears to concur:

> Where clauses on confirming forms sent by both parties conflict each party must be assumed to object to a clause of the other conflicting with one on the confirmation sent by himself. As a result the requirement that there be notice of objection which is found in subsection (2) is satisfied and the conflicting terms do not become a part of the contract.

However, acceptance of defendant's legal theory if it be sound—and the court need not pass on it here—does not compel acceptance of his position on the facts at bar. In the form sent by defendant to plaintiff there was no term indicating whether defendant wanted a gross or net measurement standard. Thus plaintiff's insertion of "as computed in gross gallons" was an addition. It was not a "different" term contradictory to or in conflict with a present term. Where a term is not mentioned in the offer it would normally be difficult to find contradiction to the offer if the term were mentioned in the acceptance. In the present case plaintiff's additional words are at most "additional terms" and certainly not "different terms"—in the contradictory or conflicting sense. The additional terms, if anything, simply clarified the existing agreement.

Accordingly, 2–207 does not change the result reached before: the parties contracted for delivery of product measured on a gross gallons basis. It should be noted in passing that 2–207(3) cannot apply in this case because, by its terms, it only is applicable where "the writings of the parties do not otherwise establish a contract." American Parts Co., Inc. v. American Arbitration Ass'n, 8 Mich.App. 156, 154 N.W.2d 5, (1967). Both parties agree that the Sale and Purchase Agreements did in fact result in a contractual relationship. The dispute is over the nature of that relationship.

This court has decided that a mandatory injunction ordering defendant to fulfill its contract with plaintiff, consistently with the Force Majeure clause in the contract, is an appropriate remedy and separate findings of fact, conclusions of law and order for judgment have been entered.